**LAKESHORE MOTOR FREIGHT CO., Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, WAREHOUSEMEN AND HELPERS OF AMERICA, TEAMSTERS' STEELHAULERS LOCAL NO. 800, et al., Defendants.**

Civ. A. No. 76–586.

United States District Court,
W. D. Pennsylvania.

Jan. 9, 1980.

Thomas D. MacMullan, Pittsburgh, Pa., for plaintiff.

Herman L. Foreman, Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This is an action to recover damages for breach of a collective bargaining agreement allegedly arising out of an illegal work stoppage which occurred from May 2, 1976 to May 17, 1976. Jurisdiction is predicated on Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. A non-jury trial was held on August 2 and 3, 1979.

The evidence at trial indicated that the collective bargaining agreement between Lakeshore Motor Freight Company and Teamsters' Steelhaulers Local No. 800 terminated on March 31, 1976, and when no agreement could be reached, there was a work stoppage pursuant to a strike vote which was authorized by the Union's international president. As a result of the strike vote, members of Local 800 and all locals covered by the National Master Freight Agreement went on strike on April 1, 1976.

The union and the employer continued to engage in efforts to reach a new agreement, and as a result, the negotiating teams reached an understanding on April 8, 1976, on a new contract proposal to be submitted to the union membership working under the National Master Freight Agreement and all of its supplements. The General President and Co-chairman of the Union Negotiating Committee ordered a referendum mail ballot on the employers' April 8, 1976 offer. The General President and Co-chairman of the Union Negotiating Committee further ordered all employees to return to work on April 9, 1976, pending outcome of the results of the mail referendum vote under the same terms as set forth in the contract that terminated on March 31, 1976. The employers' April 8, 1976 offer provided that the employees would return to work pending outcome of the mail referendum vote. All Local Union 800 members returned to work on April 9, 1976.

On May 3, 1976, the individual defendants, who were employees of the plaintiff, refused to continue to work during the interim period before the mail referendum vote was completed, declared a work stoppage and picketed. Said action was taken in apparent retaliation against the plaintiff for its refusal to adjust a long-pending dispute regarding a fuel surcharge. The action taken by the individual defendants was

contrary to the Local Union's order and without the knowledge of the Local Union. The contract was finally approved on May 9, 1976, yet the strike continued for another week.

█ Plaintiff seeks to impose liability on either Local Union No. 800 or the 32 individual defendants. There cannot be joint liability between the Union and the individual defendants. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Alloy Cast Steel Company v. United Steelworkers of America*, 70 F.R.D. 687 (N.D.Ohio 1976); *DuQuoin Packing Company v. Local P–156, Amalgamated Meatcutters*, 321 F.Supp. 1230 (E.D.Ill. 1971).

*Local Union 800 Liability*

Despite the various contentions of defendants to the contrary, this Court finds that an illegal work stoppage occurred between May 2 and May 17, 1976. Plaintiff contends that the illegal work stoppage results in union liability because the defendant, Local Union 800, violated Section 301(a) of the Labor Management Relations Act inasmuch as it did not use every reasonable means to prevent the strike or to bring an end to the illegal activity engaged in by its members. The foundation of plaintiff's contention is the case of *Eazor Express Incorporated v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 520 F.2d 951 (3 Cir. 1975), wherein the United States Court of Appeals for the Third Circuit affirmed this Court in holding that necessarily implied in a Union's agreement that there should be no strikes was an obligation on its part to use every reasonable means to bring an end to a strike begun by its members without union authorization. *Eazor* further held that unions were liable for damages proximately caused by their failure under their no-strike pledge to use all reasonable means to end unauthorized strikes.

█ Recently, however, the United States Supreme Court had occasion to review the rationale behind *Eazor*. In an opinion for a unanimous Court, Justice Brennan wrote that the question was not whether the Union did everything it might have done to prevent the strike or bring about its termination, but whether the Union instigated, supported, ratified, or encouraged the strike. *Carbon Fuel Company v. United Mine Workers of America*, —— U.S. ——, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). This Court must therefore analyze the evidence in the case *sub judice* with a view toward determining whether Local Union 800 instigated, supported, ratified, or encouraged the illegal work stoppage. Absent evidence of such affirmative conduct, liability for damages cannot be affixed to Local Union 800.

█ While the evidence when measured against the standard of *Eazor* lends itself to differing interpretations, there can be little doubt that Local Union 800 cannot be held liable for damages under the stricter standard of *Carbon Fuel*. Evidence of record proliferates that shows Local Union 800 did not instigate, support, ratify, or encourage the illegal work stoppage. When the Local Union was informed of the work stoppage, it took the following action:

1. Robert Todd, Local Union President, telephoned the Eastern Conference of Teamsters and requested their assistance to get the defendants back to work.

2. The Local Union sent a telegram to the plaintiff company advising it that the local union did not sanction the work stoppage nor have any knowledge that such work stoppage would occur prior to May 3, 1976, and that it was the intent of the Local Union to do whatever was necessary to halt the unauthorized work stoppage.

3. President Robert Todd informed the employees on the picket line that if they continued the work stoppage their union books would be lifted.

4. Both Mr. Carelli, the Local Union Secretary-Treasurer, and President Todd appeared at the plaintiff company's premises on Monday, May 3,

1976, and informed Mr. John O'Malley that the work stoppage was unauthorized and also informed the employees who were standing by the company's gates unwilling to go to work.

5. On May 3, 1976, President Todd instructed Mr. O'Malley to fire all the employees involved in the work stoppage.

6. President Todd informed the employees by letter that the work stoppage was unauthorized and that if they continued such work stoppage the union would bring disciplinary action against them.

7. On May 3, 1976, President Todd told the employees who were participating in the work stoppage at the company's premises to return to work and that if they did not do so they would all be fired and also brought before the Union's executive board resulting in possible expulsion from the Union.

8. On May 3, 1976, President Todd informed all the employees employed by the plaintiff company, by certified mail, that the work stoppage was undertaken without the consent or authorization of the Union and that failure to cease such action immediately would result in the issuance of formal charges against them.

9. On May 4, 1976, President Todd informed all of the employees employed by the plaintiff company, by certified mail, that he was filing charges against said employees for violation of Article 19, Section 6(1), (2) and (8) of the National Master Freight Agreement for engaging in a wildcat strike.

10. The local union filed charges against and scheduled trials for 37 individuals who were employed by the plaintiff company as a result of their activities in connection with the work stoppage.

11. The employees who engaged in the work stoppage were given no financial assistance by the local union.

The evidence is overwhelming that Local Union 800 did nothing to instigate, support, ratify or encourage the illegal work stoppage. Accordingly, plaintiff's evidence falls far short of satisfying the recently enunciated standard of *Carbon Fuel*, and on that basis, the relief requested against Local Union 800 will be denied.[1]

*Liability of Individuals*

◼ Plaintiff has also named as defendants in the instant suit 32 individual members of Local Union 800. As previously indicated, the Supreme Court has held that an individual union member cannot be liable for breach of a no-strike clause if the union is found to be liable. The issue presently raised, however, is whether liability can attach to an individual member if the union is found not to be liable. In *Atkinson v. Sinclair Refining Company, supra*, the Supreme Court expressly reserved judgment on the precise issue presented in the case *sub judice*.

Individual member liability in the absence of union liability, while unaddressed by the Supreme Court, is familiar to the Western District of Pennsylvania. Recently, in the case of *Westinghouse Electric Corporation v. I. U. E.*, 470 F.Supp. 1298 (W.D.Pa.1979), Judge Zeigler of this District concluded that individual members of a union could not be held liable for damages even where the union itself was exonerated from liability. Judge Zeigler felt that Con-

---

1. Plaintiff also suggested that Union liability would be appropriate because of the mass action theory which holds that a Union must be responsible for the acts of its members. *Carbon Fuel*, however, diffused this contention as well by clearly holding that a union can be bound by the acts of its members only under principles of the common law of agency. Hav-

ing expressly disavowed any association with the work stoppage, Local Union 800 cannot be bound under the common law of agency. The conduct of Local Union 800's members was not "in accordance with their fundamental agreement of association". —— U.S. at ——, 100 S.Ct. at 414.

**1154**

gress, in enacting Section 301 of the Labor Management Relations Act, did not intend to subject union members engaging in an illegal work stoppage to individual liability for damages. Furthermore, he was satisfied that the remedies of discharge or other discipline, coupled with the availability of injunctive relief, provided sufficient protection for an aggrieved employer.[2] This Court is in agreement with Judge Zeigler's analysis and thereby will deny plaintiff's request for relief against the individual defendants. *See also Sinclair Oil Corp. v. Oil, Chemical & Atomic Workers International Union*, 452 F.2d 49 (7th Cir. 1971).

The foregoing shall constitute findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). An appropriate order will issue.

### ORDER

AND NOW, January 9, 1980, in accordance with the foregoing Opinion, IT IS ORDERED that judgment is hereby entered in favor of all defendants and against plaintiff and the instant action dismissed.

---

**2.** The individual union members in the case *sub judice* did not walk away from the wildcat strike unscathed. The plaintiff company ultimately discharged all of the employees and refused to permit them to return to work with their seniority intact, despite repeated requests made by Local Union 800. While the plaintiff company eventually agreed to accept applications for employment from all but 8 of the employees who engaged in the work stoppage, these employees returned to work as new employees.