COMPLETE AUTO TRANSIT, INC., ET AL. *v.* REIS ET AL.

No. 79–1777.   Argued February 24, 1981—Decided May 4, 1981

Brennan, J., delivered the opinion of the Court, in which Stewart, White, Marshall, Blackmun, and Stevens, JJ., joined. Powell, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 417. Burger, C. J., filed a dissenting opinion, in which Rehnquist, J., joined, *post,* p. 424.

*R. Ian Hunter* argued the cause for petitioners. With him on the briefs was *C. John Holmquist, Jr.*

*Hiram S. Grossman* argued the cause and filed a brief for respondents.*

Justice Brennan delivered the opinion of the Court.

In *Atkinson* v. *Sinclair Refining Co.,* 370 U. S. 238 (1962), the Court held that § 301 (a) of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185 (a), does not authorize a damages action against individual union officers and members when their union is liable for violating a no-strike clause in a collective-bargaining agreement. We expressly reserved the question whether an employer might maintain a suit for damages against "individual defendants acting not in behalf of the union but in their personal and nonunion capacity" where their "unauthorized, individual action" violated the no-strike provision of the collective-bargaining agreement. 370 U. S., at 249, n. 7. We granted certiorari to decide this important question of federal labor law. 449 U. S. 898 (1980).

I

Petitioners are three companies engaged in the transportation by truck of motor vehicles. All three are parties to a collective-bargaining agreement with the Teamsters Union that covers operations at their respective facilities in Flint,

---

*J. Albert Woll, Laurence Gold,* and *George Kaufmann* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

Mich.  Respondents are employees of petitioners and members of Teamsters Local Union No. 332.  The collective-bargaining agreement contains a no-strike clause [1] and subjects all disputes to a binding grievance and arbitration procedure.

On June 8, 1976, respondents commenced a wildcat strike, because they believed that "the union was not properly representing them in . . . negotiations for amendments to the collective bargaining agreement."  614 F. 2d 1110, 1111 (CA6 1980).  Soon thereafter, petitioners brought this § 301 (a) action in the United States District Court for the Eastern District of Michigan, seeking injunctive relief and "damages against the [employees], in their individual capacity, for all losses arising out of the unlawful work stoppage and for attorneys fees."  App. 21.  Petitioners alleged that the strike was neither authorized nor approved by the union and, therefore, sought no damages from the union.  See 614 F. 2d, at 1115; App. 18, 20–21.  After a hearing, the District Court found that "the issue which had caused the work stoppage was not arbitrable" because it was "an internal dispute between factions in the Local," App. to Pet. for Cert. 15a–16a, and accordingly denied preliminary injunctive relief, citing *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S. 235 (1970).[2]

---

[1] The no-strike clause provides that "[t]he Unions and the Employers agree that there shall be no strike, tie-up of equipment, slowdowns or walkouts on the part of the employees, nor shall the Employer use any method of lockout or legal proceeding without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise."  See Exhibit A to Complaint of Complete Auto Transit, Inc., 24–25.

[2] In *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S., at 253–254, this Court held that the Norris-LaGuardia Act's prohibition against enjoining strikes does not apply where the "collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure," where the grievance is subject to arbitration, and where the usual requirements for obtaining equitable relief have been satisfied.

Following additional hearings and settlement of the "internal dispute," the District Court concluded that "the work stoppage continued only because of a dispute between the Local and [petitioners] over amnesty for the strikers [and that] this issue was arbitrable." App. to Pet. for Cert. 16a. The court, therefore, issued a preliminary injunction, enjoining continuation of the strike. Respondents obeyed the order and returned to work on June 21, 1976.

Nine months later, respondents moved to dissolve the preliminary injunction and to dismiss the complaint for damages. Relying on this Court's intervening decision in *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976),[3] the District Court dissolved the injunction on the ground that the work stoppage was not precipitated by an arbitrable issue. App. to Pet. for Cert. 18a. The court also dismissed petitioners' claim for damages, holding that "an employer may not sue his employees for monetary relief for breach of the collective bargaining agreement . . . whether or not the union may also be liable." *Id.,* at 16a.

The United States Court of Appeals for the Sixth Circuit reversed the District Court's dissolution of the injunction, holding that an injunction may be granted even where the issue which precipitated the strike was nonarbitrable provided an arbitrable issue, other than the simple legality of the strike itself, caused the continuation of the strike with

---

[3] In *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S., at 407 (emphasis in original), this Court held that the Federal District Court properly refused to enjoin a sympathy strike because "the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract." The Court further held that, even though the "dispute whether the sympathy strike violated the Union's no-strike undertaking . . . was arbitrable," injunctive relief was not warranted, since to hold otherwise "would cut deeply into the policy of the Norris-LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes." *Id.,* at 410.

the purpose of "compel[ling] the employer to concede on the arbitrable issue." 614 F. 2d, at 1114. Petitioners do not seek review of this part of the Court of Appeals' ruling.[4]

The Court of Appeals affirmed the District Court's dismissal of petitioners' claim for damages from the individual union members. Relying principally on the legislative history of § 301, the Court of Appeals concluded that Congress had not intended through § 301 to "create a cause of action for damages against individual union members for breach of a no-strike agreement." 614 F. 2d, at 1116. We agree.

## II

Since *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448 (1957), it has been settled that § 301(a)[5] does more than confer jurisdiction on federal courts to decide lawsuits alleging violations of collective-bargaining agreements. Section 301 (a) also "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers* v. *Lincoln Mills,* 353 U. S., at

---

[4] We express no view on whether the Court of Appeals' ruling was correct.

[5] Section 301, as set forth in 29 U. S. C. § 185, states in pertinent part:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

451. *Lincoln Mills* defined the mode of analysis for fashioning this body of federal law as follows:

> "The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem." *Id.,* at 457.

Of course, "*Lincoln Mills* did not envision any freewheeling inquiry into what the federal courts might find to be the most desirable rule, irrespective of congressional pronouncements." *Howard Johnson Co.* v. *Hotel & Restaurant Employees,* 417 U. S. 249, 255 (1974). Rather, it is clear that in fashioning federal law under § 301 (a) substantial deference should be paid to revealed congressional intention. See *Atkinson* v. *Sinclair Refining Co.,* 370 U. S., at 248–249.

In *Atkinson,* the Court relied on the intent of Congress in passing § 301 (b) to hold that individual union members may not be sued for damages where the union has breached the no-strike provision of its collective-bargaining agreement. Section 301 (b) states in pertinent part that "[a]ny money judgment against a labor organization . . . shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." Thus, in *Atkinson,* we noted that "in discharging the duty Congress imposed on us to formulate the federal law to govern § 301 (a) suits, we are strongly guided by and do not give a niggardly reading to § 301 (b)." *Ibid.* Accordingly, we consulted and relied on the legislative history of § 301 (b) which made it "clear that th[e] third clause [of § 301 (b)] was a deeply felt congressional reaction against the *Danbury Hatters* case . . . and an expression

of legislative determination that the aftermath . . . of that decision was not to be permitted to recur." *Id.*, at 248.[6] Similarly, in deciding the question presented in this case, we "discharg[e] the duty Congress imposed on us to formulate the federal law to govern § 301 (a) suits," *id.*, at 248–249, by looking to the "penumbra" of § 301 (b), 353 U. S., at 457, as informed by its legislative history. See *Howard Johnson Co. v. Hotel & Restaurant Employees, supra,* at 255.

Section 301 (b) by its terms prohibits a money judgment entered against a union from being enforced against individual union members. See *Atkinson v. Sinclair Refining Co., supra.* It is a mistake to suppose that Congress thereby suggested by negative implication that employees *should* be held liable where their union is not liable for the strike. See *Sinclair Oil Corp. v. Oil, Chemical & Atomic Workers,* 452 F. 2d 49, 52 (CA7 1971). Although lengthy and complex, the legislative history of § 301 clearly reveals Congress' intent to shield individual employees from liability for damages arising from their breach of the no-strike clause of a collective-bargaining agreement, whether or not the union participated in or authorized the illegality. Indeed, Congress intended this result even though it might leave the employer unable

---

[6] In the *Danbury Hatters* case, "an antitrust treble damage action was brought against a large number of union members, including union officers and agents, to recover from them the employer's losses in a nationwide, union-directed boycott of his hats. The union was not named as a party, nor was judgment entered against it. A large money judgment was entered, instead, against the individual defendants for participating in the plan 'emanating from headquarters' . . . , by knowingly authorizing and delegating authority to the union officers to do the acts involved. In the debates, Senator Ball, one of the Act's sponsors, declared that § 301, 'by providing that the union may sue and be sued as a legal entity, for a violation of contract, and the liability for damages will lie against union assets only, will prevent a repetition of the *Danbury Hatters* case, in which many members lost their homes.'" *Atkinson v. Sinclair Refining Co.,* 370 U. S., at 248. See *Savings Bank of Danbury v. Loewe,* 242 U. S. 357 (1917); *Lawlor v. Loewe,* 235 U. S. 522 (1915); *Loewe v. Lawlor,* 208 U. S. 274 (1908).

to recover for his losses.  See *Atkinson* v. *Sinclair Refining Co., supra,* at 248.

The legislative history of § 301 begins with a review of congressional efforts in the year prior to adoption of the Labor Management Relations Act.  Section 10 of the Case bill, H. R. 4908, 79th Cong., 2d Sess. (1946), passed by both Houses of Congress, but vetoed by the President in 1946, was "the direct antecedent of § 301." *Charles Dowd Box Co.* v. *Courtney,* 368 U. S. 502, 509 (1962).  Since § 10 "contained provisions substantially the same . . . as the provisions of § 301," *ibid.,* its legislative history is highly relevant in ascertaining congressional intent with respect to § 301, see *id.,* at 511–512.

The purpose of § 10 was "to establish a mutual responsibility when the collective-bargaining process has resulted in a contract."  92 Cong. Rec. 838 (1946) (remarks of Rep. Case).  As introduced in the House, § 10 provided for collective-bargaining agreements to be enforceable "against each of the parties thereto." [7]  The Senate adopted a bill which

---

[7] Section 10 of the Case bill provided:

"All collective-bargaining contracts shall be mutually and equally binding and enforceable either at law or in equity against each of the parties thereto, any other law to the contrary notwithstanding.  In the event of a breach of any such contract or of any agreement contained in such contract by either party thereto, then, in addition to any other remedy or remedies existing either in law or equity, a suit for damages for such breach or for injunctive relief in equity may be maintained by the other party or parties in any United States district court having jurisdiction of the parties.  If the defendant against whom action is sought to be commenced and maintained is a labor organization, such action may be filed in the United States district court of any district wherein any officer of such labor organization resides or may be found."  H. R. 5262, 79th Cong., 2d Sess. (1946).

Representative Case explained that the "parties" against whom a "suit for damages" would lie were limited to the employer and to "the recognized bargaining agent rather than an individual."  92 Cong. Rec. 765 (1946).

encompassed the purposes of § 10 of the House version and which, in addition, explicitly permitted an employer to discharge an employee who participated in a strike which was not authorized by the union.[8]  Senator Taft, principal proponent of the provision, explained:

> "If the union violates its collective bargaining-agreement, it is responsible, but no individual member is responsible, and he can in no way be deprived of his rights. But if the union tries to keep its contract and, in violation of its undertaking, some of its members proceed to strike, then the employer may fire those members and they do not have the protection of the Wagner Act." 92 Cong. Rec. 5705–5706 (1946).

Thus the Senator stopped short of proposing that individual

---

[8] Senate Amendment No. 3 to H. R. 4908, passed by the Senate, stated in pertinent part:

"(a) Suits for violation of a contract concluded as the result of collective bargaining between an employer and a labor organization if such contract affects commerce as defined in this act may be brought in any district court of the United States having jurisdiction of the parties.

"(b) Any labor organization whose activities affect commerce as defined in this act shall be bound by the acts of its duly authorized agents acting within the scope of their authority from the said labor organization and may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States: *Provided,* That any money judgment against such labor organization shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

. . . . .

"(d) Any employee who participates in a strike or other stoppage of work in violation of an existing collective-bargaining agreement, if such strike or stoppage is not ratified or approved by the labor organization party to such agreement and having exclusive bargaining rights for such employee, shall lose his status as an employee of the employer party to such agreement for the purposes of sections 8, 9, and 10 of the National Labor Relations Act: *Provided,* That such loss of status for such employee shall cease if and when he is reemployed by such employer." 92 Cong. Rec. 5705 (1946).

employees be held liable in damages for engaging in unauthorized strikes.

The House's subsequent consideration of the Senate's version reflected its clear understanding of the Senate's limitation on employers' remedies. Representative Case explained the Senate amendment on the floor of the House:

"Individual members of a union are not made liable for any money judgment, I might point out, but only the union as an entity. If employees strike in violation of their agreement, the *only* individual penalty that can be employed is the forfeiture of their right to employment under that contract which is cured when the employer reemploys them." *Id.*, at 5930–5931 (emphasis added).[9]

The House then passed the Senate version. In doing so, the House, like the Senate, clearly intended to protect employees from the sanction of a suit for damages for a strike in breach of the collective-bargaining agreement, whether or not the union participated in or authorized the strike. It is true that the President vetoed this bill and that his veto was sustained. Nevertheless, the substantial similarity between the pertinent language of the Case bill as passed by Congress and of § 301 as it reads today makes the legislative history of the Case bill vitally significant to a full understanding of the policy behind § 301 (b).

Six months after the veto, Congress began work on the legislation which became § 301.[10] The bill ultimately passed

---

[9] Representative Halleck echoed Representative Case:

"Mr. Speaker, there is substituted for that [the provision] which has to do with the responsibility of the individual who goes out on a wildcat strike in violation of a contract and in violation of the wishes of his organization. All we say is that if he breaches his contract as an individual in that manner, his employer does not have to take him back unless he wants to. What is the matter with that[?]" *Id.*, at 5932.

[10] In the House, Representative Case introduced a bill containing a provision establishing federal-court jurisdiction over actions for breaches

by the House created a federal cause of action for breach of a collective-bargaining agreement.[11] The Committee Report explained that "actions and proceedings involving violations of contracts between employers and labor organizations may be brought by either party." H. R. Rep. No. 245, 80th Cong., 1st Sess., 45–46 (1947). Section 302 (b) also contained express language precluding enforcement against in-

of collective-bargaining agreements. Subsections (a) and (b) were virtually identical to their counterparts in the bill passed in the previous session of Congress. As Representative Case explained the bill before the House Committee on Education and Labor, "there is no provision for suing individual workers, as such, or rendering any judgment against them." Hearings before the House Committee on Education and Labor on Amendments to the National Labor Relations Act, 80th Cong., 1st Sess., 125 (1947). Instead, wildcat strikers would be subject to discharge. *Ibid.*

Representative Case's testimony before the House Committee is also instructive:

"Mr. LANDIS. I agree that you can deny the members the rights of the Wagner Act, but say there is one coal mine—we had an instance in Indiana where one coal mine went out on a wildcat strike, and the United Mineworkers organization did not like it, and they tried to get the men to go back to work, and they would not go back to work, and still refused to go back to work for several days.

"Who would you sue in that case?

"Mr. CASE. Of course, I would think the United Mine Workers, as an organization, would have a pretty good defense to any suit for damages against them, if they ordered the men back to work.

"It would seem to me, if you had a local that went out on strike, and they were parties to a contract, the local would be liable for damages." *Id.*, at 126.

[11] Section 302 (a) stated:

"(a) Any action for or proceeding involving a violation of an agreement between an employer and a labor organization or other representative of employees may be brought by either party in any district court of the United States having jurisdiction of the parties, without regard to the amount in controversy, if such agreement affects commerce, or the court otherwise has jurisdiction of the cause." H. R. 3020, 80th Cong., 1st Sess. (as passed by the House) (1947).

dividuals of judgments entered against unions.[12] In addition, the bill included an amendment to § 7 of the National Labor Relations Act providing that "violations of collective bargaining-agreements" would not be protected under the Act, H. R. 3020, 80th Cong., 1st Sess. (1947), § 7 (a), thereby allowing employers to discharge wildcat strikers.[13] The House bill also included a provision, however, which *allowed* an employer to recover damages from individual employees. Section 12 created a damages action against *any person* engaging in an unlawful concerted activity. The bill defined "unlawful concerted activities" to include, *inter alia,* jurisdictional strikes, sympathy strikes, and certain picketing activities.

Significantly, however, the Senate *rejected* the House's imposition in § 12 of damages liability against individuals for unlawful concerted activity, and a Conference Committee adopted the Senate version.[14] The Senate counterpart to

---

[12] Section 302 (b) stated:

"(b) Any labor organization whose activities affect commerce shall be bound by the acts of its agents, and may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." H. R. 3020, *supra.*

[13] The Committee Report stated that "[t]he committee has revised this section by writing into it in express terms that employees who strike or engage in similar activities in violation of collective-bargaining agreements . . . forfeit the protection of the Labor Act." H. R. Rep. No. 245, 80th Cong., 1st Sess., 27 (1947).

[14] The Senate Committee on Labor and Public Welfare had earlier reported a bill creating a federal cause of action for breach of a collective-bargaining agreement. It stated in pertinent part:

"Sec. 301 (a) Suits for violation of contracts concluded as the result of collective bargaining between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act may be brought in any district court of the United States

§ 12 of the House bill was § 303. Senator Taft offered a floor amendment to § 303 which would have established a damages action against *individuals* who engage in certain types of unlawful concerted activity such as secondary boycotts and jurisdictional strikes. 93 Cong. Rec. 4900 (1947). In a critical exchange during the debate on the proposed amendment, Senator Taft altered the language to limit damages actions to claims against *unions,* in order to conform with § 301 (b) and bar imposition of individual damages liability against employees:

> "Mr. MORSE: [T]he proposal of the Senator from Ohio would open wide the doors of the Federal courts to damage suits against any person who engaged in a strike or attempted to persuade other employees to engage in a strike for one of the prohibited objectives.
>
> "The proposal would very definitely take us back at least 40 years and we would again have the spectacle of mass suits against employees, similar to the infamous Danbury Hatters case. Senators will recall that in that case some 150 members of the union were sued by their employer and the Supreme Court of the United States sustained a judgment against them in the neighborhood of a quarter million dollars. . . .
>
> "It also should be pointed out that the substitute proposal is inconsistent with the present provision in the bill allowing a union to be sued for breach of contract. Section 301 of the bill permits suits against labor orga-

---

having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this Act may sue or be sued in its common name in the courts of the United States: Provided, That any money judgment against such labor organization shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." H. R. 3020, *supra.*

nizations only, whereas the substitute proposal allows damage suits against 'any person.' Also, section 301 limits recovery to the assets of the union. The substitute allows the attachment of employees' bank accounts and all their property. .

    •    •    •    •

"Mr. TAFT: On request by . . . Senator [Ives] from New York and others who raised the point, I am amending the proposal, by striking out the word 'person,' in the second line, and inserting in lieu thereof 'labor organization,' so the action will be open only against labor organizations promoting this type of strike." *Id.,* at 4839–4841.[15]

The Senate passed this version of the bill, foreclosing individual damages liability in *both* § 301 and § 303 lawsuits.

    At conference, the Conference Committee squarely rejected § 12 of the House bill in favor of § 303 of the Senate bill, thereby refusing to create a damages action against individual employees for the conduct prohibited in that section. In addition, the Committee deleted the provision in the House bill which had removed protection under § 7 of the National Labor Relations Act for concerted activity in breach of a collective-bargaining agreement for the stated reason that the provision was unnecessary in light of recent decisions of the National Labor Relations Board. Those provisions had held that "strikes in violation of collective bargaining contracts were not concerted activities protected by the act and [the NLRB had] refused to reinstate employees discharged for engaging in such activities." H. R. Conf. Rep. No. 510, 80th

---

[15] During the floor debate, proponents of the Committee bill emphasized the limited nature of the damages remedy in the proposed legislation. For example, Senator Ball stated: "[W]e give to employers the right to sue a *union* in interstate commerce, in a Federal court, for violation of contract. It does not *go beyond that.*" 93 Cong. Rec. 5014 (1947) (emphasis added).

Cong., 1st Sess., 39 (1947). The Committee, therefore, opted for a discharge remedy for violations of § 303 by individuals, rather than for the damages remedy that had been proposed by the House. At the same time, it preferred discharge as the employer's remedy under § 301 where employees violate the no-strike provision of their collective-bargaining agreement.[16]

Thus, while § 301 (b) explicitly addresses only union-authorized violations of a collective-bargaining agreement, the "penumbra" of § 301 (b), *Textile Workers* v. *Lincoln Mills,* 353 U. S., at 457, as informed by its legislative history, establishes that Congress meant to exclude individual strikers from damages liability, whether or not they were authorized by their union to strike.[17] The legislative debates and the process of legislative amendment demonstrate that Congress deliberately chose to allow a damages remedy for breach of the

[16] "Many of the matters covered in section 12 of the House bill are also covered in the conference agreement in different form, as has been pointed out above in the discussion of section 7 and section 8 (b) (1) of the conference agreement. Under existing principles of law developed by the courts and recently applied by the Board, employees who engage in violence, mass picketing, unfair labor practices, contract violations, or other improper conduct, or who force the employer to violate the law, do not have any immunity under the act and are subject to discharge without right of reinstatement. The right of the employer to discharge an employee for any such reason is protected in specific terms in section 10 (c). Furthermore, under section 10 (k) of the conference agreement, the Board is given authority to apply to the district courts for temporary injunctions restraining alleged unfair labor practices temporarily pending the decision of the Board on the merits." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 59 (1947).

[17] Petitioners' reliance on the statement in *Hines* v. *Anchor Motor Freight, Inc.,* 424 U. S. 554, 562 (1976) (emphasis added), that "Section 301 contemplates suits by and *against individual employees*" is misplaced. We decide a much narrower question not before the Court in *Hines:* that § 301 does not contemplate recovery of *damages* from individual employees as a result of a breach of the no-strike provision of a collective-bargaining agreement. Whether *Hines* contemplated injunctive suits against individuals was not decided by the Court in *Hines* and we have no occasion to decide that issue now. See n. 18, *infra.*

no-strike provision of a collective-bargaining agreement only against *unions,* not *individuals,* and, as to unions, only when they participated in or authorized the strike. See *Carbon Fuel Co.* v. *Mine Workers,* 444 U. S. 212, 216 (1979). Congress itself balanced the competing advantages and disadvantages inherent in the possible remedies to combat wildcat strikes, and "we are strongly guided by" its choice.[18]  *Atkin-*

---

[18] Petitioners argue that a damages remedy against individual employees is *indispensable* to preserve the integrity of the collective-bargaining agreement and thereby to further the national labor policy of promoting industrial peace. This proposition is questionable on its own terms, overlooks an array of potential remedies that are available to the employer apart from a damages remedy against individuals, and in any event was rejected by Congress.

It is by no means certain that an individual damages remedy will meaningfully increase deterrence of wildcat strikes above that resulting from use of other available remedies. It is just as likely that damages actions against individuals would exacerbate industrial strife: "an action for damages prosecuted during or after a labor dispute would only tend to aggravate industrial strife and delay an early resolution of the difficulties between employer and union." *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S., at 248 (footnote omitted); see *Gateway Coal Co.* v. *Mine Workers,* 414 U. S. 368, 381, n. 14 (1974).

The significant array of other remedies available to employers to achieve adherence to collective-bargaining agreements casts further doubt on petitioners' proposition. First, an employer may seek damages against the union where responsibility may be traced to the union for the contract breach. See 29 U. S. C. § 185 (b); *Carbon Fuel Co.* v. *Mine Workers,* 444 U. S. 212, 216–218 (1979); *Atkinson* v. *Sinclair Refining Co.,* 370 U. S., at 247–249. Second, an employer may discharge, or otherwise discipline, an employee who unlawfully walks off the job. See *id.,* at 246; *NLRB* v. *Rockaway News Supply Co.,* 345 U. S. 71, 80 (1953); *Lakeshore Motor Freight Co.* v. *International Brotherhood of Teamsters,* 483 F. Supp. 1150, 1154, n. 2 (WD Pa. 1980) (wildcat strikers discharged, and those allowed to return were rehired as new employees). Third, the union itself may discipline its members. See *Carbon Fuel Co.* v. *Mine Workers, supra,* at 220; *Sinclair Oil Corp.* v. *Oil, Chemical & Atomic Workers,* 452 F. 2d 49, 54 (CA7 1971); see 92 Cong. Rec. 5706 (1946) (Sen. Capehart) (debate on Case bill). Finally, an employer may seek injunctive relief against unions for breach of a no-strike provision in a collective-bargaining

*son* v. *Sinclair Refining Co.,* 370 U. S., at 249. See *Howard Johnson Co.* v. *Hotel & Restaurant Employees,* 417 U. S., at 255. Accordingly, we hold that § 301 (a) does not sanction damages actions against individual employees for violating the no-strike provision of the collective-bargaining agreement, whether or not their union participated in or authorized the strike.

*Affirmed.*

JUSTICE POWELL, concurring in part and concurring in the judgment.

The Court's opinion makes clear that Congress, in enacting the Taft-Hartley amendments to the National Labor Relations Act, did not intend to hold individuals liable in damages for wildcat strikes. I therefore join the Court's judgment and most of its opinion. I do not, however, share the Court's view that there remains to management a "significant array of other remedies," *ante,* at 416, n. 18, with which to deter or obtain compensation for illegal strikes. In fact, the "remedies" said to be available are largely chimerical.

I

Collective-bargaining agreements typically contain a promise by the union not to strike during the agreement's term. Unions agree to these no-strike clauses in exchange for the employer's promise to arbitrate disputes arising in contract

---

agreement where the underlying dispute giving rise to the breach is subject to binding arbitration. See *Buffalo Forge Co.* v. *Steelworkers,* 428 U. S., at 407; *Gateway Coal Co.* v. *Mine Workers, supra,* at 380–387; *Boys Markets, Inc.* v. *Retail Clerks, supra.* Whether a *Boys Markets-Buffalo Forge* injunction could have issued against individual union members engaged in the wildcat strike at issue here is not before us. It may be that an injunction would not issue against a participating or authorizing union in circumstances otherwise the same: in the instant case the District Judge found that the strike commenced over a nonarbitrable labor dispute, and that ruling was not disturbed by the Court of Appeals.

administration. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 449, 455 (1957). Each promise is the *"quid pro quo"* for the other, *Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, 567 (1960), because the employer yields traditional managerial autonomy in exchange for industrial peace.

Despite the mutual benefits of the no-strike/grievance-arbitration pact, strikes in breach of contract occur with disturbing frequency. In some cases, these strikes are encouraged or even instigated by union leaders.[1] Often, however, they are true "wildcats"—strikes that arise spontaneously to protest grievances against the company and, occasionally, against the union leadership itself. Responsible unions disapprove of such strikes, but some officials, especially those at the local level, may acquiesce in them because of the fervor of intransigent members.

Whatever the cause, strikes in breach of contract frequently injure all concerned: the employer,[2] employees, and the public. Strikes and lockouts by their nature squander human working capacity, the full use of which is essential to the enjoyment of the Nation's productive potential. To be sure, the national labor policy recognizes that, in some circumstances, the use of weapons of strike and lockout is con-

---

[1] Strike encouragement sometimes is explicit but more often is cryptic. A union may employ subtle signals to convey the message to strike. One court noted that unions sometimes employ "a nod or a wink or a code . . . in place of the word 'strike.'" *United States* v. *UMW,* 77 F. Supp. 563, 566 (DC 1948), aff'd, 85 U. S. App. D. C. 149, 177 F. 2d 29, cert. denied, 338 U. S. 871 (1949).

[2] Production disruptions have obvious short-term adverse consequences. And one commentator has pointed out that the long-term consequences of these strikes may be even more severe. A strike rends the "closely integrated supply and distribution systems" that the company has developed. M. Jay Whitman, Wildcat Strikes: The Unions' Narrowing Path to Rectitude?, 50 Ind. L. J. 472, 473 (1975). Such systems "presume predictability. A business with a reputation for labor problems, let alone wildcats, simply cannot provide its customers with that predictability," *ibid.,* leading once-regular customers to seek other sources of supply.

sistent with and protected by law. Labor, management, and the public nevertheless share a "common goal of uninterrupted production." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U. S. 574, 582 (1960). The essential tenet of our labor policy is that "a system of industrial self-government" based on consensual (albeit vigorously negotiated) labor contracts, see *Steelworkers v. American Mfg. Co., supra,* at 570 (BRENNAN, J., concurring), is preferable to "strikes, lockouts, or other self-help," *Boys Markets, Inc. v. Retail Clerks,* 398 U. S. 235, 249 (1970).

When the Taft-Hartley amendments were enacted in 1947, the Nation had experienced a wave of labor unrest.[3] Congress found that "the balance of power in collective-bargaining" had been destroyed because employers, who had promised to arbitrate disputes in exchange for no-strike promises, often failed to obtain the industrial peace for which they bargained. S. Rep. 14.[4]

## II

It is increasingly clear that the 1947 Taft-Hartley amendments did not provide employers with an effective remedy for wildcat strikes. The Court today holds, properly I think, that Congress intended to foreclose a damages remedy against individual wildcat strikers. The Court states, however, that

---

[3] The Senate Report accompanying the Taft-Hartley amendments observed that the Nation in 1945 experienced "the loss of approximately 38,000,000 man-days of labor through strikes. This total was trebled in 1946 when there were 116,000,000 man-days lost. . . ." S. Rep. No. 105, 80th Cong., 1st Sess., 2 (1947) (hereinafter S. Rep.).

[4] The Senate Report stated that if workers "can break agreements with relative impunity, then such agreements do not tend to stabilize industrial relations. The execution of such an agreement does not by itself promote industrial peace. The chief advantage which an employer can reasonably expect from a collective labor agreement is assurance of uninterrupted operation during the term of the agreement. Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract." *Id.,* at 16.

there remains a number of legal weapons with which to deter or terminate illegal strikes, or to obtain compensation when they occur. *Ante,* at 416–417, n. 18. In support of its view, the Court contends that the employer may (i) obtain an injunction, (ii) discharge the strikers, (iii) request the union to use its internal disciplinary powers, or (iv) sue the union entity for damages. *Ibid.* In reality, more often than not, each of these remedies is illusory.

Injunctions in labor disputes are generally prohibited by the Norris-LaGuardia Act.[5] In *Boys Markets, Inc.* v. *Retail Clerks, supra,* the Court recognized a limited exception to the anti-injunction provisions of that Act. *Boys Markets* permits injunctions to terminate strikes pending arbitration if the grievance underlying the strike is arbitrable. However, *Boys Markets* offers only "narrow" relief, 398 U. S., at 253, because injunctions cannot be obtained in strikes of other kinds. *E. g., Buffalo Forge Co.* v. *Steelworkers,* 428 U. S. 397 (1976) (injunctions not available in sympathy strikes). Moreover, even when an injunction is available, workers on strike often are disinclined to obey it.[6] Courts may be reluctant to impose contempt penalties on individual workers; if ordered, such penalties are difficult to enforce.

Nor is discharge a realistic remedy in most cases. Because a strike in breach of contract is unprotected conduct under the National Labor Relations Act, see *NLRB* v. *Sands Mfg. Co.,* 306 U. S. 332 (1939), workers who strike illegally may be terminated. It therefore has been argued that discharge

---

[5] Section 4 of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 104, provides, in pertinent part:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute . . . ."

[6] Compare *Old Ben Coal Corp.* v. *Local 1487, UMW,* 457 F. 2d 162 (CA7 1972), with *Old Ben Coal Corp.* v. *Local 1487, UMW,* 500 F. 2d 950, 952 (CA7 1974). See Gould, On Labor Injunctions Pending Arbitration: Recasting *Buffalo Forge,* 30 Stan. L. Rev. 533, 541, and n. 47 (1978).

effectively deters strikes and punishes wrongdoers because discharge is "the industrial equivalent of capital punishment." M. Jay Whitman, Wildcat Strikes: The Union's Narrowing Path to Rectitude?, 50 Ind. L. J. 472, 481 (1975). There are at least three reasons why this remedy in practice often is not effective. First, in a large wildcat strike, wholesale discharges are not practical because an employer cannot terminate all or most of his labor force without crippling production. See *Boys Markets, supra,* at 248–249, n. 17.[7] Second, certain kinds of *selective* discharges arguably are illegal. The National Labor Relations Board takes the position that an employer may not discipline a union officer more severely than other strike participants, even where the union officer failed to fulfill a contractual undertaking to help terminate strikes.[8] In any event, discharging only selected strikers is unlikely to influence the rank and file to return to work. Such discharges actually may aggravate worker discontent and thereby prolong the strike. *Cedar Coal Co.* v. *United Mine Workers,* 560 F. 2d 1153, 1157 (CA4 1977), cert. denied, 434 U. S. 1047 (1978); see 86 Harv. L. Rev. 447, 454,

---

[7] Discharging the entire work force would "caus[e] mountainous personnel problems. Consider the sheer logistics of hiring, training and acclimating an entirely new work force with suitable skills. Even if a new labor force could be recruited, the time and expense of this process, from recruitment to full production, could very well sound the death knell of the business." Fishman & Brown, Union Responsibility for Wildcat Strikes, 21 Wayne L. Rev. 1017, 1021 (1975).

[8] *E. g., Miller Brewing Co.,* 254 N. L. R. B. 266 (1981); *South Central Bell Telephone Co.,* 254 N. L. R. B. 315 (1981); *Precision Casting Co.,* 233 N. L. R. B. 183 (1977). The Board's position is so clear that employers may be deterred from conducting selective discharges. This Court has not addressed the question, but some Courts of Appeals have not warmly received the Board's reasoning. See *Gould, Inc.* v. *NLRB,* 612 F. 2d 728 (CA3) (denying enforcement to 237 N. L. R. B. 881 (1978)), cert. denied *sub nom. Moran* v. *Gould Corp.,* 449 U. S. 890 (1980); *Indiana & Mich. Electric Co.* v. *NLRB,* 599 F. 2d 227 (CA7 1979) (denying enforcement to 237 N. L. R. B. 226 (1978)); see also *NLRB* v. *Armour-Dial, Inc.,* 638 F. 2d 51, 54–56 (CA8 1981).

n. 33 (1972). At a minimum, strikers may insist that their discharged colleagues be reinstated as a condition to returning to work. Fishman & Brown, Union Responsibility for Wildcat Strikes, 21 Wayne L. Rev. 1017, 1022 (1975). Third, arbitrators not infrequently refuse to sustain discharges of strikers. See Handsaker & Handsaker, Remedies and Penalties for Wildcat Strikes: How Arbitrators and Federal Courts Have Ruled, 22 Cath. U. L. Rev. 279, 284 (1973).

The union itself normally will not discipline its striking members. Most unions have the legal authority to take such action, see Summers, Legal Limitations on Union Discipline, 64 Harv. L. Rev. 1049, 1065 (1951), but the power seldom is used. In a wildcat strike, worker recalcitrance sometimes is directed at the incumbent union leadership as much as at company management. In these circumstances, the union's attempt to discipline is unlikely to be effective and may be counterproductive. Moreover, under this Court's decision in *Carbon Fuel Co.* v. *Mine Workers,* 444 U. S. 212 (1979), a parent union normally is not obligated to take affirmative steps to prevent or terminate a wildcat strike. Absent such an obligation, there is little incentive for the union to intervene, even where intervention would be useful.

Finally, a suit for damages against the union entity rarely is feasible.[9] Last Term, in *Carbon Fuel, supra,* we largely

---

[9] Sophisticated employers for tactical reasons may elect to forgo tenable poststrike suits for damages. As the Court points out, such suits may "exacerbate industrial strife," *ante,* at 416, n. 18, and thereby delay the dissipation of the acrimony engendered by the strike. Employers also may elect not to sue for damages because they do not want to subject themselves to the disclosure attendant to litigation. A damages suit

"necessarily involves detailed discussion of an employer's most intimate financial secrets. By making a damage claim, the employer puts its . . . finances . . . at issue in the litigation. The discovery rules of the *Federal Rules of Civil Procedure* give the union and its accountants the right to explore every corner of the employer's books. If the union conducts its case properly, it will know everything from per-unit profit to the finer

foreclosed this possibility when we held that liability normally may not be imposed on a parent union [10] absent proof that it authorized or ratified the strike.[11] It is a foolish union that would invite a damages suit by explicitly endorsing a strike in this manner. See n. 1, *supra*.

## III

The Court plainly is unrealistic, therefore, when it suggests that employers have at their disposal a battery of alternative remedies for illegal strikes. *Ante,* at 416–417, n. 18. The result of the absence of remedies is a lawless vacuum. Despite a no-strike clause, a plant may be closed with adverse consequences that often are far-reaching. The strike injures the employer, other companies and their employees, and consumers in general. Frequently, the strike is harmful even to the majority of strikers, who feel obligated to honor the picket line of minority wildcatters.

It is, of course, the province of Congress to set the Nation's labor policy. I do not suggest that authorizing a damages remedy against individual wildcat strikers would be desirable. I do believe, however, that the absence of an effective

details of [corporate] management." M. Jay Whitman, *supra* n. 2, at 474 (footnote omitted).

Finally, part of the price of settling the strike often is a promise that the company will waive its claim for damages. *Ransdell* v. *International Assn. of Machinists,* 97 LRRM 2738 (ED Wis. 1978); Gould, On Labor Injunctions, Unions, and the Judges: The *Boys Market* Case, 1970 S. Ct. Rev. 215, 231.

[10] *Carbon Fuel* did not consider the quantum of proof necessary to establish damages liability against a local union. Because of the local's proximity to workers, an inference of agency—and hence, liability—arguably may arise even without explicit proof of strike authorization or ratification. See § 301 (e) of the Act, 29 U. S. C. § 185 (e). The possibility that the local will be liable may be of little practical benefit, however, because the local often is judgment-proof.

[11] *Carbon Fuel* recognized, of course, that an explicit contractual undertaking by the parent to intervene to terminate wildcats could be the basis for damages liability. See 444 U. S., at 218–222.

remedy leaves such strikes undeterred and the public interest unprotected. The National Labor Relations Act, as amended in 1947, was intended to further broader national interests than those of either labor or management. It was conceived not only as a charter for labor rights but also as a framework of law to promote orderly labor relations. Wildcat strikes are at war with these objectives.

CHIEF JUSTICE BURGER, with whom JUSTICE REHNQUIST joins, dissenting.

The Court today holds that individual employees who, without the approval of their union, breach a covenant not to strike in the collective-bargaining agreement between their union and their employers may not be held liable for resulting damages to the employers. At stake is the fundamental principle that individuals are accountable when they breach a voluntarily executed contract.

The underlying facts in this case are not in dispute. The respondents are members of Local 332 of the International Brotherhood of Teamsters, which acts as their exclusive bargaining agent with petitioners, their employers. The union and the petitioners have entered into a collective-bargaining agreement that provides in part: ·

"The Unions and Employers agree that there shall be no strike, tie-up of equipment, slowdowns or walkouts on the part of the employee . . . without first using all possible means of settlement, as provided in this Agreement, of any controversy which might arise." App. 14-15.

Despite this covenant, the respondents embarked on what is commonly called a "wildcat" strike; it is admitted that the local union "did not aid, assist or authorize the work stoppage or a tie-up of any equipment." Id., at 25.

Section 301 (a) of the Labor Management Relations Act, 29 U. S. C. § 185 (a), makes collective-bargaining agreements enforceable in federal courts against both unions and em-

ployers. See H. R. Rep. No. 245, 80th Cong., 1st Sess., 46 (1947); S. Rep. No. 105, 80th Cong., 1st Sess., 15–16 (1947). Of course the union, acting on behalf of its members, may sue the employer for any breaches of the agreement, and the employer may sue the union for its breaches. This is no more than a corollary to the enforceability of the contract under § 301 (a). Moreover, the Court has had no problem in the past in holding the parties responsible for a breach accountable for their conduct. An employee may sue the employer directly for breach of the agreement even though the employee is not technically a party to the agreement, *Smith* v. *Evening News Assn.*, 371 U. S. 195 (1962), but the employer may not sue an individual worker for a union-sponsored breach, *Atkinson* v. *Sinclair Refining Co.*, 370 U. S. 238 (1962) (applying Labor Management Relations Act § 301 (b), 29 U. S. C. § 185 (b)). Nor may the employer sue the union for members' breaches that the union has not condoned, *Carbon Fuel Co.* v. *Mine Workers*, 444 U. S. 212 (1979).[1] This case presents the final unresolved situation: May individual union members be held accountable in a suit by the employer for a plain violation of the agreement committed without the approval of the union?

On the basis of literally centuries of the common law of contracts, one would have thought that the traditional notions of accountability for one's voluntary actions would govern. Instead, the Court holds that individual workers, acting without union approval, are a special, privileged class who may with impunity violate an agreement voluntarily reached in arm's-length bargaining. This result finds no support in the statute, it significantly undermines the usefulness and

---

[1] Thus, the union is not an "insurer" of members' compliance with the collective-bargaining agreement, or vice versa. Had this been the case, I might have been willing to join in the Court's position, for the union would remain liable for failing to see that its members abided by the agreement.

reliability of the collective-bargaining process, and it will not advance the goals the Court claims for it.

In reaching this unusual conclusion, the Court mistakenly relies on the last sentence in § 301 (b) of the Labor Management Relations Act, which states:

> "Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." 29 U. S. C. § 185 (b).

On its face, this clause does no more than insulate union *members* from personal liability for *union* breaches of the contract; Congress intended this provision to give union members a protection analogous to that afforded stockholders in corporations against personal liability for corporate acts. S. Rep. No. 105, 80th Cong., 1st Sess., 16 (1947) ("members of the union would secure all the advantages of limited liability without incorporation"). It is acknowledged that Congress added this provision to the Act to prevent a recurrence of the Danbury Hatters situation, see *Lawlor* v. *Loewe*, 235 U. S. 522 (1915); *Loewe* v. *Lawlor*, 208 U. S. 274 (1908), where the participants in a strike were held personally liable for the union's actions on the theory that the union, as an unincorporated association, could not be sued. *Ante*, at 406–407, and n. 6; *Atkinson* v. *Sinclair Refining Co.*, *supra*, at 248; 93 Cong. Rec. 5014 (1947) (remarks of Sen. Ball). But the language of § 301 (b) says nothing about holding union members harmless when they, without the approval of their union, individually breach the contract.

The special exemption in § 301 (b) affords individual union members protection against individual liability for collective action; this simultaneously encourages group action through the union—which is what unions are all about—and prevents potentially large damages awards against individual workers. But when Congress changed the law regarding *individual* lia-

bility for *union* conduct, it did not even hint at changing the common-law rule of contract law of *individual* liability for *individual* conduct, which does no more than articulate the basic idea of individual accountability essential to an organized society.[2] When an individual, either personally or, as here, through an agent, voluntarily enters into a binding agreement, that individual is liable in damages for breach. A provision whose language governs—and whose history indicates it was designed to govern—only situations of individual liability for collective action should not be construed to wipe out core principles of personal accountability for individual actions.

Curiously, the Court, *ante,* at 416, n. 18, and the respondents suggest that this anomaly will promote more harmonious relations between employers and striking workers by preventing a long and drawn-out fight in the courts. This argument is wholly specious, and it is contradicted by the views Congress expressed when it adopted § 301. Congress fully recognized that agreements, if breachable with impunity, "do not tend to stabilize industrial relations. The execution of an agreement does not by itself promote industrial peace." S. Rep. No. 105, 80th Cong., 1st Sess., 16 (1947). If workers can "have their cake and eat it too" by holding the employer liable for its breaches but receiving immunity for their own, employers will be less likely to enter into mutually satisfactory collective-bargaining agreements in the first place.

---

[2] The Court cites various comments by Members of Congress regarding immunity for union members when they act with union approval. Those remarks do not address the issue before us—individual liability for individual conduct undertaken *without* union involvement. The nearest the Court comes to finding support on that question is a remark by Senator Taft, made during debate on a predecessor bill subsequently vetoed by the President, that employers may fire "wildcat" strikers. *Ante,* at 409. Even Senator Taft's statement does not directly touch on individual liability for individual action, and, ironically, the Court's use of it follows on the heels of the Court's own admonition to avoid "suggest[ions] by negative implication." *Ante,* at 407.

"Without some effective method of assuring freedom from economic warfare for the term of the agreement, there is little reason why an employer would desire to sign such a contract." *Ibid.* Indeed, the Court's logic would insulate unions from suit as well: an action against the union for a strike it had sponsored but that since has ended similarly tends to "reopen old wounds." Moreover, I have difficulty seriously entertaining an argument that the *employer* is responsible for jeopardizing industrial harmony by seeking damages for injuries it has sustained when it was the unlawfully striking employees themselves who broke the peace in the first place. One must resist the temptation to recall the youth who, having deliberately murdered both parents, pleads for the court's mercy as an orphan.

The respondents believe—and the Court accepts, *ante,* at 416, n. 18—that the threat of discharge by the employer or discipline by the union is sufficient to ensure that collective-bargaining agreements generally will be followed by the union and its members.[3] These measures, however, are no answer; they may be too little[4] and they surely come too late, after the employer has suffered substantial losses to its business due to a strike that, under the contract, never should have occurred. In theory, the employer might mitigate damages by hiring substitute workers, but this assumes qualified work-

---

[3] The Court also mentions the employer's suit against the union itself when the union is responsible. Obviously, that remedy is wholly irrelevant to this case. See *supra,* at 425.

[4] JUSTICE POWELL, in his separate opinion, thoroughly analyzes the inadequacy of these measures. The union's impotence is demonstrated by its failure to control its members in the first place. In addition, union officers in some instances may reject discipline in the hope of appeasing "wildcat" members and bringing them back under union control. As JUSTICE BRENNAN, writing for the Court in *NLRB* v. *Allis-Chalmers Manufacturing Co.,* 388 U. S. 175, 183 (1967), aptly noted:

"Where the union is weak, . . . the union faced with further depletion of its ranks may have no real choice except to condone the member's disobedience."

ers could be found who would be willing to cross even a "wildcat" picket line.

Accountability of each individual for individual conduct lies at the core of all law—indeed, of all organized societies. The trend to eliminate or modify sovereign immunity is not an unrelated development; we have moved away from "The King can do no wrong." This principle of individual accountability is fundamental if the structure of an organized society is not to be eroded to anarchy and impotence, and it remains essential in civil as well as criminal justice. Today the Court penalizes the employer for the "wildcat" breaches of the employees and rewards those errant employees.

It seems to me that, by now, the American labor movement has matured sufficiently so that neither unions nor their members need this kind of artificial, excessively paternalistic protection for admittedly illegal acts—a protection contrary to fundamental, centuries-old concepts of individual accountability. The stability of unions and the harmony of industrial relations will be enhanced, not impaired, by applying to union members the same standards of accountability that govern all other individuals in society.[5]

This Court ought not to make two classes of contract breakers under collective-bargaining agreements, one liable and one immune. I submit that if union members understand that where they breach a contract without the approval of their union, individual liability will follow, we will very likely see fewer unauthorized strikes, for union authority will be enhanced and greater industrial harmony will likely result.

---

[5] Cf. *United States* v. *Park*, 421 U. S. 658 (1975), in which the chief executive officer of a supermarket chain was held criminally liable for permitting food to be left in insanitary conditions after notice of those conditions.