76 F.3d 606
 151 L.R.R.M. (BNA) 2600, 64 USLW 2596,
131 Lab.Cas. P 11,508
 MOUNTAINEER GAS COMPANY, a corporation, Plaintiff-Appellee,
v.
OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL UNION; Oil,
Chemical & Atomic Workers International Union,
Local 3-372; Donald R. Watson,
Defendants-Appellants.
 No. 95-1724.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 31, 1995.
Decided Feb. 26, 1996.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CA-93-862-2)
 ARGUED: John Francis Dascoli, Segal & Davis, L.C., Charleston, West Virginia, for Appellants. Joseph M. Price, Robinson & McElwee, Charleston, West Virginia, for Appellee. ON BRIEF: Robin J. Davis, Segal & Davis, L.C., Charleston, West Virginia, for Appellants.
 Before RUSSELL, WILKINS, and LUTTIG, Circuit Judges.
 Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge WILKINS and Judge LUTTIG joined.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This case comes before this court as union member Donald Watson and the Oil, Chemical & Atomic Workers International Union, Local 3-372 challenge the district court's grant of summary judgment to Mountaineer Gas Company. The district court refused to enforce an arbitration award, which had been awarded to Watson, reasoning that the arbitrator's award failed to draw its essence from the collective bargaining agreement between Mountaineer Gas Company and the Oil, Chemical & Atomic Workers International Union. Although we hesitate, for the integrity of the arbitration process, to condone the vacating of an arbitration award, we are compelled to do so in this instance because the arbitrator created an award that exceeded his powers and failed to draw its essence from the collective bargaining agreement.
 
 I.
 
 2
 On August 27, 1991, Mountaineer Gas Company ("Mountaineer"), a public utility engaged in the transportation and supply of natural gas in West Virginia, terminated the employment of Donald R. Watson, a meter repairman in the operations department, after he failed to pass a random drug test. Challenging his discharge, Watson initiated a grievance against Mountaineer. Pursuant to the collective bargaining agreement ("the CBA") between Mountaineer and the Oil, Chemical & Atomic Workers International Union, Local 3-372 ("the Union"), Watson's grievance proceeded to arbitration.
 
 
 3
 In August 1993, the arbitrator reinstated Watson without back pay and converted Watson's permanent discharge into a disciplinary suspension. On September 10, 1993, Mountaineer filed a complaint in district court seeking to vacate the award. Mountaineer alleged that the award contravened public policy and failed to draw its essence from the CBA between the Union and Mountaineer. The district court granted Mountaineer's motion for summary judgement and vacated the award on the ground that it did not draw its essence from the CBA.II.
 
 
 4
 The Union contends that the district court lacked the requisite authority to overrule the arbitrator's award, because the judiciary is to presumptively favor the award's validity. See Richmond, Fredericksburg & Potomac R.R. Co. v. Transportation Communications Int'l Union, 973 F.2d 276, 278 (4th Cir.1992). In labor arbitration cases, it is recognized that a reviewing court generally defers to the arbitrator's reasoning. Island Creek Coal Co. v. District 28, United Mine Workers of America, 29 F.3d 126, 129 (4th Cir.1994). And, absent any fraud by the parties or dishonesty by the arbitrator, an arbitrator's findings should never be overturned. United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 370-71, 98 L.Ed.2d 286 (1987). After all, the parties to a collective bargaining agreement bargained for the arbitrator's interpretation and resolution of their dispute. United Steelworkers v. Enterprise Wheel & Car Corporation., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). Yet, we acknowledge that arbitration awards may be overturned if the award violates well-settled and prevailing public policy, fails to draw its essence from the collective bargaining agreement or reflects the arbitrator's own notions of right and wrong. Misco, 484 U.S. at 36, 42, 108 S.Ct. at 369, 373.
 
 
 5
 To determine whether any of these conditions existed we must examine the business Mountaineer is engaged in, the regulations it must abide by, its own operating procedures and policies, the parties to the collective bargaining agreement, and the arbitration award. Above all, we must determine only whether the arbitrator did his job--not whether he did it well, correctly, or reasonably, but simply whether he did it. Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 903, 130 L.Ed.2d 786 (1995). Because the question of whether a labor arbitrator exceeded the scope of his authority is a question of law, this court reviews the district court's ruling de novo. Island Creek Coal Co., 29 F.3d at 129.
 
 
 6
 When determining whether the arbitrator did his job, this court examines: (1) the arbitrator's role as defined by the CBA; (2) whether the award ignored the plain language of the CBA; and (3) whether the arbitrator's discretion in formulating the award comported with the essence of the CBA's proscribed limits. As summarized by the Supreme Court:
 
 
 7
 [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.
 
 
 8
 United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).
 
 A.
 
 9
 The CBA to which Mountaineer, the Union, and Watson are parties reserved to Mountaineer the following rights:
 
 
 10
 It is agreed that there shall be no hindrance or interference with the Management of the Company in its several departments, including the determination of Company policy, which does not interfere with the conditions of the Agreement as affecting wages, hours of work, and working conditions. All rights of Management, except insofar as the same are expressly modified in the terms of this Agreement, are hereby reserved to the Company, and the Company specifically has the power and the right to manage the business and direct the working forces, including but not limited to, the right to hire, suspend or discharge for proper cause....
 
 
 11
 The CBA also contained an arbitration provision which stated that the arbitrator shall limit his decision to the issue submitted by the parties and "shall have no authority to amend, add to, or subtract from this Agreement."
 
 
 12
 Because Mountaineer is a public utility, it is required by various state and federal laws not only to assure the safe operation of its pipelines and equipment, but to assure a drug free workplace. In particular, Mountaineer must abide by the 1988 Drug Free Work Place Act, 41 U.S.C. §§ 701-707, and the Department of Transportation Pipelines Regulations, 49 C.F.R. § 40 and Pt. 199, which require that certain pipeline facility operators test employees for the presence of prohibited drugs and provide an employee substance abuse assistance program.
 
 
 13
 In response to the federal and state mandates, Mountaineer instituted an alcohol and drug abuse policy (hereafter"the Drug Policy") in April 1990, which became effective in February 1991. Mountaineer's Policy committed the company to:
 
 
 14
 [A]n alcohol and drug abuse program that emphasizes three elements: eradication of any alcohol or drug use which may imperil employees' or the public's well-being or safety; assistance and support for employees who voluntarily seek alcohol or drug abuse treatment; and firmness in dealing with employees found to be abusing alcohol or drugs. As a reflection of its commitment, the company has implemented an Employee Assistance Program ("EAP") that includes counseling for alcohol or drug problems for all employees and their eligible family members....
 
 
 15
 The Drug Policy also stated that Mountaineer would conduct testing of employees to help detect abuse. The Drug Policy requires random urine specimen drug testing for "[a]ny employee in a safety-sensitive position." All positions within the Operations Department are considered safety-sensitive.
 
 
 16
 Although an employee testing positive for substance abuse can request re-analysis, the Drug Policy cautions that such an employee testing positive for drugs, absent a legitimate medical reason for the positive result, will be promptly discharged and may be subject to reinstatement if the original sample analysis is found to be incorrect. The Drug Policy goes on to state that "notwithstanding the re-analysis option, any employee discharged because of a positive test result will be considered by [Mountaineer] for re-employment after successful completion of a rehabilitation program at the expense of the discharged employee and submission of proper application forms."
 
 
 17
 At the time of Watson's discharge, he was employed in a "safety-sensitive" job. On August 27, 1991, he provided a positive specimen, which showed the presence of marijuana metabolites.[1] As mandated by the Policy, Mountaineer sent Watson a discharge letter on September 10, 1991, stating the discharge resulted from Watson's failure to pass a random drug test.
 
 
 18
 Watson challenged the discharge, and his complaint went to arbitration. The arbitrator determined:
 
 
 19
 (1) Watson occupied a "safety-sensitive position;"
 
 
 20
 (2) Mountaineer had a vested right under the CBA to implement a mandatory random drug testing for employees;
 
 
 21
 (3) The findings made by a previous arbitrator sustaining the validity of the Policy were a matter of res judicata;[2]
 
 
 22
 (4) The chain of custody for Watson's positive specimen was sufficient; and
 
 
 23
 (5) The procedure used for testing Watson's specimen was not defective.
 
 The arbitrator nonetheless continued:
 
 24
 The Arbitrator does, however, agree with the Union that [Watson's] unblemished work history over 15 years of employment with [Mountaineer], the Arbitrator finds that there was not just cause for his termination. The Arbitrator rejects the Policy as applied here and finds that just cause for immediate termination did not exist under these circumstances.Employers implement Employee Assistance Programs in order to rehabilitate and retain valuable employees with personal problems. Substance abuse is always a key element of any properly implemented EAP. Often it takes being 'caught' or the threat of discharge or discipline, for employees to seek professional help. Grievant's/[Watson's] inability to utilize this program after testing positive undermines the purpose and effectiveness of the EAP.
 
 
 25
 The Arbitrator has great difficulty with a substance abuse policy that permits rehabilitation for voluntary assistance but terminates without recourse anyone who is 'caught' by a positive drug test. Since [Mountaineer's] Policy was upheld by Arbitrator Beilstein, revision or invalidation of the Policy on its face is improper since the matter is res judicata. Although Arbitrator Beilstein upheld the Policy on its face that does not mean that there are not individual exceptions to the strict application of the Policy. Laws and policies upheld on their face can always be challenged in their application. The Arbitrator agrees with the Union that leniency should have been afforded [Watson] since he tested negative in February and September and showed no signs whatsoever of poor or adverse job performance.
 
 
 26
 (emphasis added).
 
 B.
 
 27
 The Union seeks to collaterally attack the Drug Policy by reasoning that the arbitrator was not required to uphold employee discharges mandated by the Drug Policy because the language of the CBA permits Mountaineer to discharge only for "proper cause." The Union argues therefore, that the arbitrator only had to determine whether Watson's discharge was for "proper cause" rather than assume that a violation of the Drug Policy constituted "proper cause."
 
 
 28
 Contrary to the Union's contention, we find that the Drug Policy was to be interpreted and enforced in accordance with the CBA. A valid and proper policy promulgated by an employer pursuant to a collective bargaining agreement is enforceable; it need not be specifically incorporated by reference into the collective bargaining agreement. Consequently, when the collective bargaining agreement reserves to management the right to make and enforce disciplinary rules, any rules or policies promulgated in accordance with that authority are thus incorporated into the collective bargaining agreement and have the force of contract language. General Drivers, Warehousemen & Helpers Local Union 968 v. Sysco Food Services, Inc. 838 F.2d 794, 796, 799 nn. 1 & 4 (5th Cir.1988).
 
 
 29
 The CBA gave Mountaineer the requisite authority to enforce the Drug Policy and to discharge Watson for violating the Drug Policy. The arbitrator's role clearly prohibited him from amending, adding to, or subtracting from the CBA. Therefore, by converting Watson's permanent discharge into a disciplinary suspension, the arbitrator did not do his job. Instead, the arbitrator blatantly ignored the unambiguous language of the Drug Policy and fashioned a modified penalty that appealed to his own notions of right and wrong. We agree with the district court's holding that the arbitrator lacked the authority to create an individualized exception to the strict application of the Drug Policy. And the words "proper cause" of the CBA cannot be the loophole through which the arbitrator bypasses the Drug Policy's mandatory language to implement his own brand of industrial justice. In reinstating Watson, the arbitrator illegally created an exception to the strict application of the Drug Policy's mandatory termination. By fashioning an entire new remedy and infusing his personal feelings and sense of fairness into the award, the arbitrator created an award that failed to draw its essence from the CBA, which clearly reserved to Mountaineer the right to promulgate and enforce such drug policies.
 
 III.
 
 30
 For the foregoing reasons, the district court's decision to vacate the arbitration award and grant summary judgment to Mountaineer Gas Company is
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 Watson underwent an independent retest in which his specimen tested negative. Mountaineer was not provided any information concerning the retest until arbitration
 
 
 [2]
 When Mountaineer originally implemented its Policy, the Union challenged the reasonableness of the Policy's immediate termination provision for a positive drug test. The Union's challenge went to arbitration. In January 1992, the arbitrator denied the Union's grievance concluding that given the nature of Mountaineer's business, the Drug Policy and its provision for immediate termination without the opportunity for rehabilitation, were not an unreasonable exercise of Mountaineer's management rights