179 F.3d 133,
DISTRICT 17, UNITED MINE WORKERS OF AMERICA; Local Union
7555, United Mine Workers of America, Plaintiffs-Appellants,
v.
ISLAND CREEK COAL COMPANY, Defendant-Appellee.
 No. 98-1229.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 2, 1998.
Decided June 3, 1999.
 
 ARGUED: William D. Ryan, District 17, UMWA, Charleston, West Virginia, for Appellants. ON BRIEF: Albert F. Sebok, Jackson & Kelly, Charleston, West Virginia, for Appellee. Kelley L. Mount, Jackson & Kelly, Charleston, West Virginia, for Appellee.
 Before ERVIN and NIEMEYER, Circuit Judges, and HILTON, Chief United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge ERVIN wrote the opinion, in which Judge NIEMEYER and Judge HILTON joined.
 OPINION
 ERVIN, Circuit Judge:
 
 
 1
 The United Mine Workers of America, and Local Union 7555 ("the Union"), filed this action in the United States District Court for the Southern District of West Virginia seeking the vacatur of an arbitration award granted in favor of Island Creek Coal Company ("the Company"). The Union appeals from the district court's grant of summary judgment in favor of the Company. Because we agree with the district court that the award (1) drew its essence from the collective bargaining agreement; (2) did not violate public policy; and (3) did not evidence the arbitrator's own notions of justice, we affirm.
 
 I.
 
 2
 Island Creek, a coal mining and processing company, operated the Elk Creek mining facility using its own employees until the late 1980's. At that time, the Company began contracting out the facilities' mining operations. One of these contractors was Shield Mining, Inc. ("Shield"). Shield's contract with the Company required Shield to hire some of the miners previously laid-off by the Company. These miners were known as the Island Creek panel. Under this arrangement, Island Creek monitored the payment of wages and benefits to panel members.
 
 
 3
 In February of 1997 the manager at the Elk Creek facility discovered that Shield was delinquent in its workers' compensation and health care premium payments for the unionized miners it employed. As a result, Island Creek terminated its contract with Shield and sent a guard to close down Elk Creek's operations, effectively locking out all Shield employees.
 
 
 4
 On March 11, a group of Shield employees gathered in the road about a half-mile from the Elk Creek facility and 150 yards off of Island Creek property to protest the Company's failure to pay their wages and benefits. They did not threaten, abuse, or dissuade people from entering the plant. On his way to work, Bill Waybright ("Waybright"), the plant foreman, saw them and stopped to ask them what was happening. Some of the men responded that they wanted answers about the status of their delinquent pay and benefits and were going to stop work at the facility until they got some answers. Pat Workman ("Workman"), the mine superintendent, also passed by around this time and asked the men the same question. The men again responded that they wanted their money. Workman drove back later that morning and spoke directly with Christopher Hurley ("Hurley") about the protest. Hurley replied that they would not leave until they got their money or the Company obtained a temporary restraining order and that they planned to continue protesting for all three shifts that day. Hurley talked to Workman two more times during the protest, once about the Company's inability to get a train loaded and again to notify Workman that the protests were over.
 
 
 5
 During the protest, the Shield employees were positioned on the only access road to the Elk Creek facility and maintained a presence there for about five days. The protest caused Island Creek and other contract employees to stop working. As a result, the plant lost two full days and three partial days of production.
 
 
 6
 Workman was able to identify five of the protesting Shield employees. They were Chris Blankenship ("Blankenship"), William Cook, Sr. ("Cook"), Louis Collings, Sr. ("Collings"), Otis Brooks ("Brooks") and Hurley. Each of these men received a letter on March 17, 1997, informing them that they were suspended pending discharge for their role in the protest. All employees who received the letter were later discharged. Because all parties were signatories to the 1992 National Bituminous Coal Wage Agreement ("NBCWA"), the NBCWA's grievance and arbitration provisions governed the discharges.
 
 
 7
 On March 21, the Union filed grievances protesting the employees' discharges. The grievances could not be resolved by the parties and were referred to arbitration. Collings' grievance was presented to Arbitrator Harry Graham, who sustained the grievance and directed that Collings be restored to the panel. Blankenship and Cook's grievances were consolidated and presented to Arbitrator Kathleen Jones Spilker, who also sustained the grievances and directed the company to reinstate the protesters to the panel.
 
 
 8
 Between these two arbitrations, the grievances of Brooks and Hurley were referred to Arbitrator Jerome H. Ross. Arbitrator Ross found that a significant portion of the employees' dispute involved grievable matters such as wages, pay for vacations, holidays and sick leave, Christmas bonuses, and clothing allowances. Having found that the protesters impermissibly picketed over matters that were subject to arbitration under the collective bargaining agreement, Arbitrator Ross denied the grievances and sustained the Company's discharge of Brooks and Hurley.
 
 
 9
 Thereafter, the Union filed suit in the United States District Court for the Southern District of West Virginia seeking to vacate the award. Acknowledging the narrow scope of judicial review of arbitration decisions, the district court refused to reverse the arbitrator's ruling that the protesters were picketing illegally over Shield's alleged failure to pay wages and benefits, a dischargeable offense pursuant to the NBCWA and Arbitration Review Board ("ARB") Decision No. 108. See J.A. at 131. On these grounds, the district court ruled that Arbitrator Ross' award drew its essence from the contract and should be affirmed. The Union appeals.
 
 II.
 
 10
 Federal courts have the authority to review the decisions of labor arbitrators pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1998), but this review is severely limited; it is "among the narrowest known to the law." Union Pacific R. Co. v. Sheehan, 439 U.S. 89, 91, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978). See also Clinchfield Coal Co. v. District 28, UMWA, 720 F.2d 1365, 1368 (4th Cir.1983). In The Steelworkers Trilogy, the Supreme Court warned that "courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "[S]o far as the arbitrator's decision concerns construction of the [labor] contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The rule has emerged that,
 
 
 11
 the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.
 
 
 12
 Misco, 484 U.S. at 38, 108 S.Ct. 364.
 
 
 13
 The Fourth Circuit has closely adhered to the tenets of The Steelworker's Trilogy, noting that where the challenge is to "the merits of an arbitrator's award ... the standard of justification is much more stringent. Indeed, because such challenges, if undeterred, inevitably thwart the national labor policy favoring arbitration, they must be considered presumptively unjustified." United Food & Commercial Workers, Local 400 v. Marval Poultry Co., Inc., 876 F.2d 346, 351 (4th Cir.1989); see also Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Internnational Union, 76 F.3d 606, 608 (4th Cir.1996) ("In labor arbitration cases, it is recognized that a reviewing court generally defers to the arbitrator's reasoning."); Island Creek Coal Co. v. District 28, UMWA, 29 F.3d 126, 129 (4th Cir.1994) ("An arbitrator's award is entitled to special judicial deference on judicial review").
 
 
 14
 Nevertheless, there are limits to what arbitrators may do. An arbitrator's award may be overturned if it "violates well-settled and prevailing public policy, fails to draw its essence from the collective bargaining agreement or reflects the arbitrator's own notions of right and wrong." Mountaineer Gas, 76 F.3d at 608. Mindful of these constraints on the scope of our review of arbitration awards, we turn to the merits of the Union's argument.
 
 III.
 
 15
 The Union argues that Arbitrator Ross' award should be vacated on three grounds. First, the Union insists that Arbitrator Ross' award fails to draw its essence from the contract because it ignores critical contract language establishing that the protesters were not restricted from protesting these grievances. Second, it contends that the award violates public policy protecting an employee's ability to engage in peaceful concerted activity to contest unpaid wages, benefits, and medical bills. Finally, the Union asserts that the award reflects the arbitrator's own notions of justice because he failed to follow arbitral precedent which the Union contends had a res judicata effect on Arbitrator Ross' decision and mandated the protesters' reinstatement.
 
 A.
 
 16
 First, the Union insists that Arbitrator Ross' award did not draw its essence from the NBCWA. As stated previously, an arbitrator's interpretation of the collective bargaining agreement is what the parties bargained for in negotiations and therefore, this interpretation is entitled to great deference. Even though we may not agree with an arbitrator's interpretation of a collective bargaining agreement, we must affirm it "so long as it 'draws its essence from the agreement.' " Upshur Coals Corp. v. United Mine Workers of America, Dist. 31, 933 F.2d 225, 229 (4th Cir.1991) (citing Enterprise Wheel, 363 U.S. at 597, 80 S.Ct. 1358); see also Misco, 484 U.S. at 38, 108 S.Ct. 364 ("[A] court should not reject an award on the ground that the arbitrator misread the contract.").
 
 
 17
 The Union insists that Arbitrator Ross ignored the plain language of the contract when he rejected the Union's argument that, because a major portion of the protesters' claims were for non-grievable medical benefits, they were not required to submit to the grievance and arbitration procedures established in the NBCWA and could legally protest their dispute without reprisal. The Union points to Article XX, HEALTH AND RETIREMENT BENEFITS, Section (d) of the NBCWA which exempts disputes over medical benefits from the required grievance and arbitration procedure as proof that Arbitrator Ross ignored the NBCWA. The Union contends that Arbitrator Ross' failure to address this critical contract language justifying the protesters' actions proves that his award fails to draw its essence from the NBCWA.
 
 
 18
 Despite the Union's insistence otherwise, the gravamen of the Union's complaint is not with Arbitrator Ross' failure to properly construe the contract, but with his findings of fact. Arbitrator Ross found as a matter of fact that a significant portion of the protesters' dispute was over grievable matters such as wages, vacation pay, and sick leave. He did not ignore the fact that the employees were also protesting non-grievable medical benefits. Instead, based on the testimony and evidence before him, he concluded that the major issues in the dispute concerned grievable matters. He also found it undisputed that Brooks and Hurley were among a group of picketers that caused other employees to stop working at the plant. Based upon this factual determination, Arbitrator Ross held that by resorting to picketing instead of arbitration to solve their grievable disputes, Brooks and Hurley violated the NBCWA and were subject to discharge.
 
 
 19
 This Court is bound to accept the factual findings of an arbitrator. See Richmond, Fredericksburg & Potomac R. Co. v. Transportation International Union, 973 F.2d 276, 281 (4th Cir.1992) ("[T]he reviewing court's task is to enforce the bargained-for decision of the arbitrator and not to evaluate the arbitrator's factual findings."). Accepting Arbitrator Ross' findings of fact as we must, we evaluate whether he properly applied the relevant provisions of the NBCWA to these facts in fashioning his award.
 
 
 20
 After finding that the protesters were picketing over grievable matters in violation of the NBCWA, Arbitrator Ross determined that the case was governed by ARB No. 108. See J.A. at 131. Incorporated into the NBCWA through Article XXIII, Section (k),[1] ARB No. 108 establishes that picketing over grievable matters is a dischargeable offense. Relying on this arbitral precedent, Arbitrator Ross found that the protesters' discharges were warranted.
 
 
 21
 It is clear from his ruling that Arbitrator Ross did not ignore the language of the NBCWA. In fact, his reliance on applicable arbitral precedent indicates that he made every effort to interpret and apply the NBCWA according to its own provisions. It cannot be said, therefore, that Arbitrator Ross' award fails to draw its essence from the contract.
 
 
 22
 The Union's challenge to the award in effect asks this Court to reconsider the arbitrator's findings of fact, something that given our limited scope of review, we cannot do. Because we will not reconsider Arbitrator Ross' factual determination that the majority of the dispute concerned grievable matters and because we find that his award evidences a reasonable interpretation of the NBCWA and relevant arbitral precedent, we hold that the award draws its essence from the contract.
 
 B.
 
 23
 The Union argues that Section 7 of the National Labor Relations Act ("NLRA") and the First Amendment right to freedom of assembly establish that there is a well-defined and dominant public policy protecting a worker's right to engage in concerted activity for the mutual aid and benefit of workers subject to the same collective bargaining agreement. Because Arbitrator Ross' award sustains the protesters' discharges for participating in that type of activity, the Union insists the award violates public policy and should be vacated.
 
 
 24
 Federal courts can refuse to enforce an arbitrator's award because it is contrary to public policy, see W.R. Grace & Co. v. Local Union 759, International Union of Rubber, Cork, Linoleum and Plastic Workers of America, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), but courts should be reluctant to do so. See Misco, 484 U.S. at 43, 108 S.Ct. 364. The Supreme Court has held that in order to vacate an award on public policy grounds, it must find that an explicit, well-defined public policy exists and the policy is one that specifically militates against the relief ordered by the award. See id. at 44, 108 S.Ct. 364.
 
 
 25
 The Union asserts that Arbitrator Ross' award violates two dominant public policies. First, the Union contends that Section 7 of the National Labor Relations Act evidences an established public policy protecting a worker's right to engage in the type of concerted activity at issue here; allowing the Company to discharge these employees in retaliation for this activity violates that policy. Second, the Union argues that the employees' activity was a protected exercise of their First Amendment right to freedom of assembly.
 
 
 26
 Before we consider whether Section 7 evidences a well-established public policy, we must determine whether the protesters' actions are even protected under Section 7.
 
 
 27
 Section 7 of the NLRA provides that "employees shall have the right to ... join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in bargaining or other mutual aid or protection." See 29 U.S.C. § 157. Arbitral and judicial precedent have established that informational picketing is protected under Section 7 of the NLRA. See Cowin & Co., Inc. v. Snow, 322 N.L.R.B. 1091 (Feb. 18, 1997) (affirming that informational type picketing in which the worker merely publicizes a dispute but does not try to induce a work stoppage is protected activity under Section 7). Not so of strikes and picketing aimed at causing a work stoppage over matters that the collective bargaining agreement explicitly provides will be subject to arbitration. See Complete Auto Transit, Inc. v. Reis, 451 U.S. 401, 420, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981) ("Because a strike in breach of a contract is unprotected conduct under the NLRA, ... workers who strike illegally may be terminated."); see also Cowin, 322 N.L.R.B. 1091 (affirming an Administrative Law Judge's ruling that when a worker parked his car on the access road to the work site at the start of the morning shift and placed a sign in the windshield reading "Unfair Labor Practice," he was not engaged in a protected informational picket, but an illegal strike in which he intended to produce a work stoppage).
 
 
 28
 The Union insists that the protesters were exercising their Section 7 rights when they congregated outside the plant because they did not intend to cause a work stoppage, but merely to publicize their dispute for the mutual aid and protection of all of the Shield employees who were being denied wages and benefits.
 
 
 29
 The record does not support the Union's contention. This Court must be bound by the facts as found by Arbitrator Ross and he found it undisputed that Brooks and Hurley were among many men who gathered along the only access road to the Elk Creek plant at strategic points in time. Furthermore, the Arbitrator concluded that the picketing was what caused other employees at the plant to refuse to work. Arbitrator Ross also determined that the picketers knew that their actions would cause a work stoppage. He found as a matter of fact that the protesters were picketing over predominantly grievable matters such as unpaid wages, vacation time, and sick leave in violation of the NBCWA. Based on these factual determinations, Arbitrator Ross relied on ARB No. 108 and held that foregoing the contractually-mandated arbitration process to picket over grievable matters constitutes grounds for discharge. See ARB No. 108 at 17 (holding that as little as "[o]ne man standing at the entrance to a mine is sufficient" to constitute picketing which is "a capital offense ... itself warrant[ing] discharge.").
 
 
 30
 The factual record establishes that Brooks and Hurley were not engaged in concerted activity protected under Section 7 of the NLRA. Because we find that the protesters' conduct did not constitute a protected Section 7 activity, we need not consider whether Arbitrator Ross' award violates public policy in this respect.
 
 
 31
 The Union also argues that Arbitrator Ross' decision violates the protesters' First Amendment rights to freedom of assembly. We need not address this argument, however, because the Union failed to raise it before the arbitrator. This Court has held that when a party consents to arbitration it cannot attack the award on grounds not raised before the arbitrator. See United Food & Commercial Workers Local 400 v. Marval Poultry Co., Inc., 876 F.2d 346, 352-53 (4th Cir.1989) (holding that after voluntarily submitting to arbitration, a party cannot challenge the arbitrator's award on grounds not raised in arbitration); International Chemical Workers' Union Local 566 v. Mobay Chemical Corp., 755 F.2d 1107, 1112 (4th Cir.1985) (same). The Union's failure to raise this issue below precludes this Court from considering it as a basis to vacate the arbitrator's award.
 
 C.
 
 32
 Finally, the Union argues that Arbitrator Ross' award is predicated, not on the law, but on his own notions of right and wrong and should be vacated. Specifically, the Union asserts that the arbitrator intentionally ignored the applicability of ARB No. 78-24. Arbitrator Graham issued an award reinstating Collings eight days before Arbitrator Ross dispensed his award sustaining Brooks and Hurley's discharges. The Union insists that the arbitral precedent established in ARB 78-24 mandates that Arbitrator Graham's award was controlling in the case before Arbitrator Ross because they were based on the same operative facts. We disagree.
 
 
 33
 As established, ARBs are incorporated into the NBCWA through Article XXIII, Section (d) and aid an arbitrator in fashioning an award. ARB No. 78-24 provides that in cases that involve the same parties and the same facts "the arbitrator is bound to apply the prior award even though he would not have decided the prior case in that fashion."[2]
 
 
 34
 As an initial matter, ARB No. 78-24 only applies in cases in which the facts before the arbitrator are the same as those presented in prior arbitration. That is not the case here. Although each of the arbitrators was operating with the same set of general facts about the picketing, each employee testified on his own behalf at his hearing. From that testimony, each of the arbitrators made his own distinct factual findings. It is not possible that the protesters' testimony was identical. For example, Arbitrator Ross' findings of fact included several references to Hurley's comments to Workman during the protest indicating that Hurley was a leader among those protesting. Arbitrator Graham's findings contain no such references. Because the facts on which these two arbitrators made their determinations were not the same, we find that ARB 78-24 was inapplicable here.
 
 
 35
 Arbitrator Ross was correct in making his own factual findings and fashioning a unique award. The facts with which he was presented were unique and required individual treatment. Because we think ARB 78-24 did not apply here, Arbitrator Ross' refusal to rely on it was proper and does not prove that his award was premised on his own notions of justice.
 
 IV.
 
 36
 For the foregoing reasons, we find that Arbitrator Ross' award sustaining Brooks and Hurley's discharges drew its essence from the contract and did not violate public policy. The district court's judgment in favor of the Company is hereby affirmed.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 Article XXIII, Section (k) reads in pertinent part:
 All decisions of the Arbitration Review Board rendered prior to the expiration of the ... Agreement ... shall continue to have precedential effect under this Agreement to the extent that the basis for such decisions have not been modified by subsequent changes in this Agreement.
 
 
 [2]
 There are four explicit exceptions articulated in ARB No. 78-24 whereby an arbitrator can refuse to give preclusive effect to a prior arbitration decision. None of the exceptions apply in this case and neither party raises this argument