Paul S. BRUCE

v.

LOCAL 333, INTERNATIONAL LONG-SHOREMEN'S ASSOCIATION AFL—CIO

and

Steamship Trade Association of Baltimore, Inc.

No. Civ CCB–01–0138.

United States District Court, D. Maryland.

Feb. 20, 2002.

Steven G. Warm, Baltimore, MD, Joseph T. Mallon, Jr., Law Offices of Joesph T. Mallon, Jr., LLC, Baltimore, MD, for plaintiff.

Joel A. Smith, Kahn Smith and Collins PA, Baltimore, MD, Travis M. Mastroddi, Baltimore, MD, for Local 333, Intern. Longshoremen's Ass'n, AFL-CIO, defendant.

Gil A. Abramson, Hogan and Hartson LLP, Baltimore, MD, for Steamship Trade Ass'n of Baltimore, Inc.

## MEMORANDUM

BLAKE, District Judge.

■ Now pending before this Court are motions brought by defendants Local 333, International Longshoremen's Association, AFL—CIO ("Local 333"), and Steamship Trade Association of Baltimore, Inc. ("STA"). Defendants move to dismiss the claims against them, or in the alternative, move for summary judgment. Because materials in the form of affidavits and exhibits thereto have been submitted by both sides, the motion will be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b)(6). Plaintiff Paul S. Bruce is a longshoreman in Baltimore who has been a member of Local 333 since January of 1971. Plaintiff has brought a "hybrid" claim alleging a breach of the duty of fair representation by Local 333 (Count I), *see Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and alleging that STA has breached the relevant collective bargaining agreements between Local 333 and STA (Count II). *See* Labor Management Relations Act ("LMRA") § 301, *codified at* 29 U.S.C. § 185. This matter has been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons stated below, the court will grant defendants' motion on both counts.

## BACKGROUND

Plaintiff Bruce is a longshoreman who has been a member of Local 333 since January 1971. Defendant Local 333 is an unincorporated labor organization that represents longshoremen in the Port of Baltimore (the "Port"). Longshoremen represented by Local 333 provide labor to stevedoring firms that are in the business of loading and unloading oceangoing cargo vessels. Local 333 was created pursuant to a decree issued by Judge Harvey in *United States v. Int'l Longshoremen's Ass'n*, 319 F.Supp. 737 (D.Md.1970) (the "Decree") which merged two racially segregated union locals into a single, racially integrated local. Defendant STA is an industry trade association that represents the interests of stevedoring firms doing business in the Port and negotiates labor agreements with union locals including Local 333. Three separate agreements control the terms of employment of Local 333 members who are assigned to STA member-employers. There is first a "Master Agreement" that is negotiated on a regional basis and covers all ILA Atlantic and Gulf ports; second, an agreement covering all ILA locals in the Port of Baltimore entitled "Provisions Applicable to All Locals"; and third, a specific individual agreement between STA and Local 333 called the Cargo Agreement (collectively, the Collective Bargaining Agreement

("CBA")). (Byan Aff. at ¶ 5.) [1]

During the time period relevant to this litigation, plaintiff was employed as a "gang carrier." A gang carrier is the head of a gang of longshoremen, and one becomes a gang carrier through an election held by gang members. Typically, the gang consists of 15 to 20 employees, each of whom specializes in a trade and falls into one of a number of employment categories such as "top men," "longshoremen," "drivers," "foremen," "power mechanics" and "refrigeration mechanics."

The gang system has been in place for more than 60 years. The system for assigning employees to each gang, however, was significantly revised upon issuance of the Decree and the subsequent creation of Local 333. Prior to the Decree, gang carriers themselves selected permanent and temporary gang members. Subsequent to the creation of Local 333, hiring into the gangs was and is still conducted through a Central Hiring Center ("Hiring Center") on the basis of seniority and other contractual qualifications within each job category. Each union member is assigned to a job category, and vacancies for jobs are filled on the basis of seniority within each category. Thus, if an STA employer wishes to hire a power mechanic, it must notify the Hiring Center that a position is available and select a qualified union member according to job category and seniority ranking. Only after the ranks of available longshoremen in a particular category have been completely depleted may the employer hire from another category. Thus, the most junior qualified power mechanic will be hired before more senior union members from other job categories.

This hiring process is governed by the CBA and administered by the Seniority Board. (Court's Ex. 1, CBA, at 148–50.) The Seniority Board is provided for in the Cargo Agreement, and its function is to "administer the seniority system, to decide all employment disputes under the seniority system, and to determine whether any seniority rules were broken and remedy any that were." (Byan Aff. at ¶ 14.) According to paragraph 22(D) of the Cargo Agreement, "[t]he Board shall determine whether [seniority] rules have been broken, and shall have the power to correct any violation, and order payment of loss of wages to any employee who suffers any losses because of the violation." (Court's Ex. 1, CBA, at 149.) "Seniority" itself is defined as "the basis upon which all longshoremen in the Port of Baltimore are accorded priority of employment either individually or by gang." (*Id.* at 148.)

The issue in this case is how temporary gang carriers are assigned when the permanent gang carriers are unavailable for work. It is undisputed that permanent gang carriers are chosen by the members of the gangs themselves, and the propriety of this practice under the CBA is not challenged. When a gang requires a new permanent carrier, the members of the gang elect the carrier and promote one of its members. The vacancy left by the elevated member (who was once a longshoreman, top-man, mechanic, etc.) is then filled through the Hiring Center. Disagreement exists over whether the same procedure may be followed for the selection of temporary carriers, i.e., gang carriers who fill in for the permanent carrier. The parties agree that, in practice, the most senior, permanent member of the gang replaces the carrier who is temporarily unavailable. (Byan Aff. ¶ 11.)

---

1. *See also Bruce v. Int'l Longshoremen's Ass'n,* 7 F.Supp.2d 609, 611–12 (D.Md.1998) (describing same agreements in earlier case brought by plaintiff against Local 333 and STA).

Plaintiff argues, however, that under the CBA, employers must hire temporary gang carriers through the Hiring Center, instead of allowing a temporary promotion from within the already existing ranks of the gang.

Plaintiff has suffered layoffs of one or two days a week for at least the past three years. (Bruce Aff. at ¶ 2.) On days his own gang was laid off from its normal work, plaintiff arrived at the Hiring Center in hopes of obtaining temporary employment as a fill-in carrier with another gang. (*Id.* at ¶ 3.) Plaintiff noticed that there were no incoming calls for fill-in gang carriers, and that instead "temporary gang carrier positions were being filled by STA and Local 333 through individuals already on the payroll of the company where a vacancy had appeared." (*Id.* at ¶ 4.) Plaintiff alleges that this practice is in "clear violation" of the CBA's prescribed procedures for assigning temporary positions at the Port. (*Id.*) Plaintiff founds this allegation on language in the CBA that reads "[n]o employer, supervisor, foreman and/or gang carrier will hire any fill-ins during the periods when the Dispatch Center is open for business unless the fill-in has a valid dispatch slip." (Court's Ex. 1, CBA, at 89.)

Plaintiff made oral complaints regarding this practice to union officials "at least once a month during the last three years" leading up to this suit, and claims that those officials told plaintiff they would file a complaint with the Seniority Board. (Bruce Aff. at ¶ 5.) No action having been taken by the union officials, plaintiff filed a formal "complaint or grievance" with the Seniority Board on June 30, 2000, which was unanimously denied at its July 11, 2000 meeting. (Bruce Aff. Ex. 2 and 3.) Plaintiff was formally notified of the Seniority Board's decision via letter dated July 20, 2000. (Bruce Aff. Ex. 3.)

Plaintiff filed this civil action on January 16, 2001 alleging a breach of the duty of fair representation against defendant Local 333, and a breach of the CBA against defendant STA, seeking damages, attorney's fees, interest, costs, and seeking to enjoin further action of the Seniority Board on the ground that its membership is improperly constituted according to Judge Harvey's 1971 Decree.

### *Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving

party," *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### Analysis

In their motion, defendants argue that plaintiff's claims are time-barred given the six-month statute of limitations that apply to § 301/fair representation claims. In the alternative, defendants argue that plaintiff "admitted" he did not have a claim in a letter addressed to defendants' counsel. Finally, defendants argue that the practices complained of by plaintiff do not violate the CBA, and are sanctioned by an implied contractual term that can be discerned from past practices.

■ Without directly addressing all of defendants' arguments, the court nonetheless finds that summary judgment is appropriate because plaintiff has failed to show that the union breached its duty of fair representation. As the Fourth Circuit recently stated, "in order to prevail on the merits against either party, an employee must prove *both* 1) that the union breached its duty of fair representation and 2) that his employer violated the collective bargaining agreement." *Thompson v. Aluminum Co. of America*, 276 F.3d 651, 656 (4th Cir.2002) (emphasis in original).

### I. Duty of Fair Representation

■ In narrowly defined circumstances, Section 301/fair representation claims allow union employees the opportunity to seek relief based on rights created in a collective bargaining agreement where they have already contracted away the ability to directly pursue claims against their employers. Where there is a collective bargaining agreement that "contains no grievance, arbitration or other provisions purporting to restrict access to the courts," § 301 permits a unionized employee to seek relief in federal court directly against an employer that is party to the agreement. *Vaca*, 386 U.S. at 183, 87 S.Ct. at 913. Most collective bargaining agreements, however, contain alternative dispute resolution provisions that restrict employees' access to the courts and designate arbitration or other grievance procedures to resolve questions involving rights under the contract. In general, employers and employees must live with the results of these proceedings and can only challenge their outcomes on the most limited of grounds. *See Dist. 17, United Mine Workers of America v. Island Creek Coal Co.*, 179 F.3d 133, 136–37 (4th Cir.1999) (federal court's authority to review decisions of labor arbitrators pursuant to § 301 of the LMRA is extremely limited). As explained by the Fourth Circuit, this limited review of the dispute resolution process established by collective bargaining agreements is consistent with federal labor law policy of "adjustment by the parties of disputes arising under a collective bargaining agreement." *Amburgey v. Consolidation Coal Co.*, 923 F.2d 27, 29 (4th Cir.1991); *see also* LMRA § 203(d), 29 U.S.C. § 173(d).

The Supreme Court has recognized the injustice that would be committed if employees were limited to the exclusive remedial procedures provided for in the collective bargaining agreement when a union wrongfully refused to process a grievance. *Vaca*, 386 U.S. at 185, 87 S.Ct. at 914. "We cannot believe that Congress, in conferring upon employers and unions the power to establish exclusive grievance procedures, intended to confer upon unions such unlimited discretion to deprive injured employees of all remedies for breach

of contract." *Id.,* 386 U.S. at 186, 87 S.Ct. at 914. To prevent this injustice, the Court has consistently upheld the rule that employees may bring suit against both the employer and the union where the union has breached its duty to represent the employee fairly and the employer has breached the collective bargaining agreement. *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 163–65, 103 S.Ct. 2281, 2290–2291, 76 L.Ed.2d 476 (1983).

▇ In order to prove that defendant Local 333 breached its duty of fair representation, plaintiff must prove that the union acted arbitrarily, discriminatorily, or in bad faith. *Thompson,* 276 F.3d at 657; *see also Smith v. Local 7898, United Steelworkers of America,* 834 F.2d 93, 96 (4th Cir.1987). This is a very difficult standard to meet.

▇ It is clear that in any given union, some members may have interests distinct from other members. In these situations, the union may need to assign relative priorities to some interests over others. Where this is the case, and "the interests of members of the bargaining unit are not identical, a union may be unable to achieve complete satisfaction of everyone. It is granted a 'wide range of reasonableness' so long as it acts with 'complete good faith and honesty of purpose.'" *Smith,* 834 F.2d at 96 (*quoting Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)). Disputes over seniority, like the one at issue in this case, "invariably mean that, in the end, one's gain is another's loss." *Id.* at 96. A breach of the duty of representation involves more than the exercise of poor judgment in the attempt to balance these conflicting interests. *Id.* Indeed, " 'honest, mistaken conduct' does not violate the union's duty of fair representation." *Id.* (*quoting Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employ-*

*ees v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971)). As the Fourth Circuit noted in *Ash v. United Parcel Service, Inc.,* "[s]imple negligence, ineffectiveness, or poor judgment is insufficient to establish a breach of the union's duty. Rather, the union's conduct must be 'grossly deficient' or in reckless disregard of the member's rights." 800 F.2d 409, 411 (4th Cir.1986) (per curiam) (internal citation omitted); *see also Power v. Kaiser Foundation Health Plan of the Mid–Atlantic States Inc.,* 87 F.Supp.2d. 545, 552 (E.D.Va.2000); *Bruce v. Int'l Longshoremen's Ass'n,* 7 F.Supp.2d 609, 615 (D.Md.1998.)

## II. Local 333's Conduct

▇ Plaintiff has failed to present evidence of facts upon which a jury could reasonably base a finding that Local 333 breached its duty of fair representation. Plaintiff alleged that the duty to fairly represent was breached because Local 333 wrongfully "recogniz[ed] the right of STA employers to fill vacancies from other than the Central Hiring List in direct contradiction of the labor agreement." (Compl. at ¶ 30.) This "recognition" does not constitute a breach of the duty of fair representation since it appears from the evidence that representatives of Local 333 reasonably believed that this was the correct interpretation of the CBA. Not only has the challenged practice been in place for almost 30 years, (Byan Aff. at ¶¶ 6–10), but Local 333 consulted counsel to ensure that its interpretation of the CBA was correct. (*See* Bruce Aff.Ex. 4.) It is unimportant whether Local 333's interpretation of the CBA was in fact correct, since if the union's interpretation was mistaken, it appears to have been an honest, good faith mistake.

Presumably, plaintiff believes that not only should Local 333 have "recognized"

the virtue of his position, but once his grievance was brought before the Seniority Board, union representatives should have compelled arbitration of the grievance. There is no dispute between the parties that the Seniority Board was the proper forum for plaintiff to grieve this claim. The Seniority Board is created pursuant to paragraph 22 of the Cargo Agreement; it has power to "determine whether any [seniority] rules ... have been broken, and [has] the power to correct any violation ..." (Court's Ex. 1, CBA, at 149.) The Seniority Board is made up of four employer and four union representatives, and according to the Cargo Agreement it is "the sole judge of the sufficiency of evidence considered and its decisions [are] final and binding on all concerned, except that those decisions shall not be in conflict with applicable law." (*Id.* at 148.) [2] If the Seniority Board is unable to reach a decision on an issue before it, the matter may be referred for further grievance proceedings that may include the eventual referral to an independent arbitrator. (*Id.* at 149.) Upon consideration of Bruce's grievance, the Seniority Board unanimously denied it, thus resolving the issue finally and precluding further proceedings. Had the union representatives voted in favor of plaintiff, they could subsequently have requested further grievance proceedings. However, there was no evidence whatsoever presented that would suggest that the decision not to vote in favor of plaintiff and request further grievance proceedings was arbitrary, in bad faith, or based upon some discriminatory intent.

█ Plaintiff alleges in the complaint that Local 333 was in fact motivated by an intent to discriminate against him on the ground that he was a gang carrier. (Compl. at ¶ 30.) Yet, this is not the type of "discrimination" that could constitute a breach of the duty of representation. *See, e.q., Steele v. Louisville & N.R. Co.,* 323 U.S. 192, 202–03, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944) (holding racial discrimination constitutes breach of duty of fair representation). Instead, Local 333 "discriminated" between union members based upon their job classifications and seniority in the allocation of limited jobs. As decisions regarding job classifications and seniority that are made in good faith and honesty in purpose are granted a "wide range of reasonableness," *Smith,* 834 F.2d at 96, this court finds that Local 333's conduct easily fits within this standard. Local 333 adopted a reasonable position that was bolstered by the advice of counsel: that temporary gang carriers may be promoted from within gangs rather than having to be hired at the Hiring Center. This has been the practice since the inception of Local 333 almost 30 years ago, and defendants' counsel believed that this practice may be sanctioned by implied contractual terms. (Bruce Aff.Ex. 4.) As counsel to Local 333 advised its President:

> I see no purpose to a change in past practice. Indeed, one might argue that the past practice has been honored for so long a period of time and in such a consistent fashion that it is a matter of contract which binds the Union, the STA, and the Seniority Board. There is, in fact, as I see it, no explicit language which requires a change in practice. Certainly, from what I know of the 1996 negotiations, no change was intended in how the parties were to go about filling temporary vacancies in gang carrier positions on a day-by-day basis.

---

**2.** In this case, only two representatives from each side participated in the meeting. The presence of these four representatives was sufficient to constitute a quorum. (*Id.* at 149.)

(Bruce Aff.Ex. 4 at 2.) Bruce has provided no evidence to contradict this statement of many years' past practice.

Plaintiff introduces two additional sets of facts through exhibits to affidavits, possibly in the hope of using them to prove that Local 333 acted arbitrarily. First, plaintiff introduces a letter from defendants' counsel that was sent to the National Labor Relations Board regarding an entirely separate matter from 1997. (Bruce Aff.Ex. 5.) The letter, however, is not inconsistent with Local 333's current position, and thus could not tend to prove that defendant acted arbitrarily or in bad faith.[3]

■■■ Second, plaintiff introduces Judge Harvey's Decree that established Local 333 and the initial Seniority Board in 1971. Plaintiff argues that the Seniority Board which considered his grievance was improperly constituted according to the terms of the Decree. It is true that the Decree ordered the creation of the Seniority Board and designated its initial members, however this court finds that, by its terms, it was not intended to control the membership of the Seniority Board in perpetuity. The plan adopted in the Decree set forth the initial membership of the Seniority Board, and Judge Harvey ordered that the union seek to implement the plan in future collective bargaining agreements. (Decree at 4.) Assuming without finding that Bruce has standing to raise this issue, the court finds no violation of Judge Harvey's decree.

Having found that Local 333 did not violate its duty of fair representation, this court need not inquire into the question of whether STA violated the CBA. *See*

*Thompson,* 276 F.3d at 658 ("Our conclusion that the Union did not breach its duty of fair representation resolves the case for Alcoa as well.") Because Local 333 acted in conformity with its duty to fairly represent, plaintiff is foreclosed from enforcing his rights under the CBA in this court.

A separate order follows.

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1.  Defendants' motion for summary judgment is **GRANTED** with respect to both Counts I and II;

2.  copies of this Order and the accompanying Memorandum shall be mailed to counsel of record; and

3.  the clerk of the court shall **CLOSE** this case.

---

3.  The letter states that "hiring into the gangs is also done on the basis of seniority. On a daily basis, temporary gang vacancies, or 'fill-ins' are to be filled through the Hiring Center which is operated and administered by STA."

(Bruce Aff.Ex. 5. at 12.) The letter did not address the issue of fill-in gang carriers, and this court does not find that any language in it directly contradicts defendants' position in this case.